**IN RE: ALYSIA S.**

Court of Appeals of Tennessee,
AT NASHVILLE.

October 21, 2014 Session

Filed December 17, 2014

Application for Permission to Appeal
Denied by Supreme Court
March 16, 2015.

538

Stephen Walker Pate and Mark L. Kent, Murfreesboro, Tennessee, for the appellant, Mother.

Brad William Hornsby and Heather Graves Parker, Murfreesboro, Tennessee, for the appellees, Mr. & Mrs. Mitchell.

Susan Gail Cox, Guardian ad Litem.

## OPINION

Brandon O. Gibson, J., delivered the opinion of the Court, in which Frank G. Clement, Jr., P.J., M.S., and Andy D. Bennett, J., joined.

This is the second appeal before this Court involving the minor child at issue. In 2010, the child's mother sought assistance in caring for the child after she lost her job. She signed a power of attorney and authorization of temporary guardianship stating that the child would reside with another couple for approximately six months. During that period, the couple filed a petition alleging that the child was dependent and neglected and seeking temporary custody of her. The juvenile court found the child dependent and neglected and granted custody to the couple. The mother appealed to the circuit court, which found no clear and convincing evidence of dependency and neglect and ordered the juvenile court to reunify the child with the mother. On appeal, this Court affirmed the decision of the circuit court. Despite these holdings, the child was never reunified with the mother. The couple with the child filed a petition in the juvenile court to terminate the mother's parental rights on four grounds. The juvenile court found clear and convincing evidence of abandonment and persistent conditions and determined that it was in the child's best interest to terminate the mother's parental rights. The mother appealed. We find no clear and convincing evidence of grounds for termination of the mother's parental rights and accordingly reverse and remand this matter to the juvenile court for the entry of an order that implements a plan to expeditiously reunite the child with her

mother. Having found that the trial court erred in terminating Mother's parental rights, we dismiss the termination petition, reinstate Mother's parental rights, vacate the juvenile court orders concerning visitation and guardianship, and designate the current custody and guardianship orders as temporary in nature.

## I. FACTS & PROCEDURAL HISTORY

This case has a lengthy but significant factual and procedural history. Kathryn S. ("Mother") gave birth to a daughter, Alysia, in December 2006. At the time, Mother was married to the child's father, who was serving in the military. However, Mother and the child's father were separated for the majority of her pregnancy and for extended periods after the birth of the child. The child's father did not visit or support her after her first birthday. He and Mother eventually divorced, his parental rights were terminated, and that decision is not at issue on appeal. This case only involves Mother's rights.

By the summer of 2010, Mother and three-year-old Alysia were living in a public-housing apartment in Waverly, Tennessee. Mother was working and also taking college courses in Clarksville, Tennessee. However, Mother's car "broke down," which caused her to lose her job and rendered her unable to attend her college courses. Alysia was scheduled to begin a Head Start program in the coming weeks, and Mother was unable to take her to the necessary appointments for immunizations. Mother felt that she was having a "nervous breakdown" and sought help from someone she trusted, Charlene S., who was the ex-wife of Alysia's father and the mother of Alysia's half-sister. Charlene agreed to care for Alysia temporarily while Mother looked for work and attempted to find another vehicle. Charlene's home was in Dickson, Tennessee, about 45 minutes away from Mother's home in Waverly. Charlene came to Mother's home to retrieve Alysia and her suitcase on June 9, 2010.

A few days later, Charlene informed Mother that she was allowing Alysia to attend vacation bible school with Charlene's close friends, the Mitchells, while Charlene worked during the daytime. Unbeknownst to Mother, Alysia began spending the night with the Mitchells at their home in Smyrna, Tennessee, rather than staying the night at Charlene's home in Dickson.

Also within days of Alysia leaving Mother's home, the Tennessee Department of Children's Services ("DCS") contacted Mother. Alysia's grandfather (Mother's father) had reported concerns to DCS about Mother's living conditions and possible drug use. Alysia briefly returned to Mother's home when Mother met with a DCS case worker on or about June 13, 2010. The case worker did not observe any concerns during that home visit. She determined that Alysia appeared to be in good health, with no marks or bruises, and she did not observe any environmental concerns in the home or evidence of drug or alcohol use. Mother informed the case worker that Alysia was staying with a family friend.

Mother attended a meeting at a DCS office on June 18, 2010. Charlene also attended the meeting, but the Mitchells did not. During this meeting, Mother signed a standard DCS form entitled "Power of Attorney for Care of a Minor Child." This document listed Charlene as the child's "caregiver" and authorized her to enroll the child in extracurricular activities, to obtain medical and dental treatment for the child, and to provide for the child's food, lodging, housing, recreation and travel. Mother also signed a second document, entitled, "Power of Attorney

Authorization of Temporary Guardianship." Mrs. Mitchell obtained this form from the Internet and edited it to suit her needs because the Mitchells were planning to travel with Alysia in the near future. She faxed the document to Charlene prior to the meeting. The document stated,

I, the Parent/Guardian of the Child hereby grant temporary guardianship to the Temporary Guardian for the period from the 10 day of June 2010 and expiring on the 1 day of January 2011.[1]

The Mitchells were listed as the temporary guardians, with only a telephone number and email address listed for their contact information. The document stated that the parent acknowledged that the child would "reside" and "may travel reasonably" with the temporary guardians. It also authorized the temporary guardians to make daily decisions regarding the child's activities, childcare, and school placement, to administer treatment for minor injuries or illnesses, and to act in loco parentis for the child in circumstances necessitating medical treatment. According to Mother, Charlene explained to her that this document was necessary to enable Alysia to stay with the Mitchells for vacation bible school and daytime child care while Charlene was working, but, according to Mother, Charlene said that Alysia would be staying at Charlene's house at night. One of the DCS caseworkers told Mother that signing the document was "the right step" because Mother had no vehicle or transportation that would enable her to reach Alysia in the event of an emergency. Although Mother understood that Alysia would be staying with Charlene only for a few weeks, Charlene told Mother to date the power of attorney for a later date just in case something happened.

Also during the June 18 meeting, Mother, Charlene, and the DCS caseworkers signed a "Non–Custodial Permanency Plan." The plan identified Charlene as the "resource mom." It listed as "desired outcome[s]" that Mother would be able to care for herself and Alysia, would continue to have a bond with the child, and would be drug-free. As "action steps" to achieve these goals, the plan directed Mother to complete an alcohol and drug-assessment, follow its recommendations, and submit to random drug screens; apply for a free federal phone and maintain contact with DCS; obtain legal income; maintain stable housing; and call and visit Alysia. Mother took a drug screen that same day, which tested positive for marijuana. The non-custodial permanency plan was never submitted to a court for ratification.[2]

According to Mother, in the days and weeks following the June 18, 2010 DCS meeting, she called Charlene and Mrs. Mitchell in attempts to see Alysia, but they gave her "one excuse after another" as to why they could not bring Alysia to Mother. Toward the end of July, Mother learned that Alysia was actually living with the Mitchells rather than merely staying with them during the day. In August, Mother called the Mitchells and informed them that she was coming to get Alysia. Mrs.

---

1. The portion of the document underlined herein was handwritten in the original in the record.

2. By statute, parties to a permanency plan "for any child in foster care" must be provided with a copy of the criteria and procedures for terminating parental rights, including the definitions of "abandonment." Tenn.Code Ann. § 37–2–403(a)(2)(A). This provision is "designed to inform parents, before they engage in conduct constituting abandonment, of the potential consequences of that conduct." *In re K.C.*, No. M2005–00633–COA–R3–PT, 2005 WL 2453877, at *10 (Tenn.Ct.App. Oct. 4, 2005). Alysia was not placed in foster care, so DCS did not advise Mother of the criteria and procedures for terminating parental rights.

Mitchell told Mother "that was not a possibility" and that it was her understanding that Mother was not allowed to retrieve Alysia. Mother did not know the Mitchells' address. She went to the police department on three occasions in an attempt to get help in retrieving her daughter, to no avail. The police department refused to assist Mother because DCS was involved. DCS records also demonstrate that Mother also contacted the department on several occasions to report that the Mitchells would not allow her to get her child. The caseworker assigned to Mother's case was apparently out of the office for three weeks during this time, so Mother was unable to obtain assistance from her. Mother was told to wait until her caseworker returned to the office. Mother did take a second DCS drug screen on August 24, which she passed. She also completed an alcohol and drug assessment at a private facility at her own expense.

According to Mother, she was eventually told that Charlene and the Mitchells were bringing Alysia to meet her at a certain fast food restaurant, but none of them arrived as planned. Instead, Mother was met by a process server, who served her with a petition for dependency and neglect. The petition was filed by the Mitchells on August 26, 2010, in the juvenile court of Rutherford County, alleging that Alysia was dependent and neglected and seeking an award of temporary custody to the Mitchells.

Shortly thereafter, on September 13, 2010, the Mitchells reported to DCS that Alysia told them that her seven-year-old half-sister (Mother's other daughter) "licked her bootie" while in Mother's care.[3] Separate forensic interviews of the two children were completed at a child advocacy center. The case was reviewed by a child protective investigative team, which included a member of law enforcement, a representative of the district attorney general's office, a representative from juvenile court, the DCS case worker assigned to Mother's case, a representative of the child advocacy center, and two other individuals whose position is not clear from the record. On or about October 5, 2010, the investigative team unanimously agreed that the allegations should be classified as unfounded. The investigative team concluded that there was no basis for prosecution and that no follow-up services were necessary. Accordingly, DCS closed its file on the allegation of sexual abuse. However, the Mitchells took Alysia to a sexual assault center where she began counseling.

Following a probable cause hearing, by order entered October 14, 2010, the Rutherford County Juvenile Court found "probable cause to believe that [Alysia] is dependent and/or neglected and is in need of supervision from the Court." The order gave the Mitchells temporary custody and awarded Mother supervised visitation and pre-scheduled monitored telephone calls with the child. On October 19, 2010, Mother met with DCS caseworkers again and signed a "Family Permanency Plan." The plan stated that when DCS responded to the initial call, it found Mother's home "in good condition with no concerns for Alys[i]a." The plan noted that Mother had signed a power of attorney to allow Charlene to care for Alysia while Mother looked for a job. The plan stated as a permanency goal that the child would remain with Mother with services, and it set a goal target date of February 2011. Mother passed a third DCS drug screen that day.

---

3. Alysia's half-sister went to stay with Mother's parents in June 2010, when Alysia went to stay with Charlene.

Another home visit was also conducted by DCS that day, and according to the case worker, everything in the home looked "perfectly fine." Days later, when DCS learned that custody had been placed with the Mitchells by the Rutherford County Juvenile Court, it closed its case without notifying Mother of that decision.

The juvenile court held three adjudicatory hearings on the dependence and neglect petition in October and November 2010. On November 14, 2010, Mother began monthly supervised visitation with Alysia at the Exchange Club in Murfreesboro, Tennessee, which was roughly two hours from Mother's home. Despite Mother's efforts to visit and/or regain custody of Alysia, this supervised visit was the first time Mother saw Alysia since June. The first visit went well, according to the records from the Exchange Club. Alysia separated easily from Mrs. Mitchell when Mrs. Mitchell left. During the visit, Alysia "showed affection towards [Mother] by hugging her and telling her she loved her at the beginning and the end of the visit." Mother and Alysia played games and interacted. They had appropriate conversations, and all conversations were positive. Mother was described as "focused" and "connected," and the visit monitor said Mother "actively listened" as Alysia "talk[ed] freely." According to the monitor, Alysia "appeared at ease with [Mother] during the visit as evidenced by smiling, playing and laughing."

Alysia turned four years old on December 9, 2010. On December 15, 2010, the juvenile court ordered Mother to pay $596 per month in child support to the Mitchells. Mother and Alysia had another su-

pervised visit at the Murfreesboro Exchange Club on December 16. Again, Alysia separated easily from Mrs. Mitchell. She hugged Mother at the beginning and end of the visit. When Mother told Alysia she loved her, Alysia did not respond. However, Alysia smiled and laughed as she played and shared toys with Mother, and Mother "had a smile on her face during the entire visit." At the next visit on January 13, 2011, Alysia again "appeared at ease" with Mother and smiled and played with her. Alysia showed affection to Mother. She sat in Mother's lap, and when Mother told Alysia she loved her, Alysia "responded in kind." Mother brought some items to give to Alysia, but the supervisor informed her that all gifts had to be sent directly to Mrs. Mitchell pursuant to a recent court order, so the items were taken and returned to Mother at the end of the visit.

By order entered January 21, 2011, the juvenile court found Alysia to be a dependent and neglected child. The juvenile court removed Mother's superior parental rights and awarded the Mitchells custody and full decision-making authority. The juvenile court gave Mother limited supervised visitation at the Murfreesboro Exchange Club (one visit per month for one hour) and one fifteen-minute telephone call per week with the child. In its ruling from the bench, the juvenile court found that Mother's credibility was "absolutely zero," that the Mitchells and their supporting witnesses had shown "great credibility," and that the finding of dependency and neglect was proven by clear and convincing evidence pursuant to Tennessee Code Annotated section 37–1–102(b)(12)(F) and (G).[4] The juvenile court specifically found

---

**4.** Tennessee Code Annotated section 37–1–102(b)(12) lists ten grounds upon which a court may find a child dependent and neglected. Pursuant to subsection (F), a child is dependent and neglected when the child "is

in such condition of want or suffering or is under such improper guardianship or control as to injure or endanger the morals or health of such child or others." Pursuant to subsection (G), a child "[w]ho is suffering from

that the evidence supporting a finding of dependency and neglect included Mother's "constant lies," testimony that Alysia was present in the home when Mother and her friend would smoke marijuana, "immoral" photographs Mother posted on her My-Space profile, and the fact that Mother "totally abandoned" Alysia by leaving her with Charlene and by not visiting Alysia once she knew Charlene left her with the Mitchells.

Mother appealed this finding to circuit court.[5] On March 3, 2011, Alysia's grandparents (Mother's parents) filed a motion to intervene requesting that they be allowed to file a separate petition for dependency and neglect regarding Alysia. This was permitted by agreed order. The circuit court conducted *de novo* hearings on the Mitchells' and the grandparents' petitions over the course of four days between April and June 2011.[6] Mother, Charlene, Mrs. Mitchell, Mr. Mitchell, the grandmother, and the grandfather testified. At the close of the proof, the circuit court judge made several findings and rulings from the bench. At the outset, the circuit court found that the juvenile court had exceeded its authority in granting the disposition of custody of Alysia to the Mitchells, as they were non-parents, and no one

had conducted a study of their home to determine if they were qualified to receive care of the child. Next, the circuit court addressed the substance of the allegations of dependency and neglect. The judge acknowledged that Mother "had some serious problems" in June of 2010 when she ceded temporary custody of Alysia to non-parents, and it recognized that the petitioners had presented "some proof" regarding Mother's allegedly immoral conduct. However, the court found there was no showing that Mother's alleged immorality had any impact on the child. The court explained:

> So I think what's really happened here, the Mother realized she couldn't take care of the child for a while and sought help. She didn't take care of her problems right away, and still has problems. I don't think there's any issue but she still has problems. But I don't think that falls under the category of dependent/neglect which would remove her superior rights as a parent under these particular circumstances. There has got to be some clear and convincing evidence that really takes away her superior rights as a parent in this situation, I think. And I just don't think it's here.
>
> . . . .

abuse or neglect" is a dependent and neglected child.

5. Around this time, in February and March 2011, Mother had two more supervised visits with Alysia. At the February visit, Alysia sat in Mother's lap and seemed comfortable doing so. She allowed Mother to hug and kiss her but did not reciprocate the hugs and kisses, and she "wiped off" one kiss from Mother. At the March visit, however, Alysia smiled and laughed as she played with Mother and did not show any discomfort when Mother initiated affection. Alysia "responded in kind when [Mother] told her that she loved and missed her," and she "was receptive to giving [Mother] a hug when she asked at the end of the visit."

6. In April 2011, Alysia refused to participate in a supervised visit after she arrived and was told that another individual would be supervising the visit. Alysia said that she wanted to go home and did not want to visit Mother, so she was not required to visit.

Mother had another supervised visit with Alysia on June 9, 2011. When Alysia arrived and was asked about visiting Mother, Alysia said she was ready to go and ran into the visitation room where Mother was waiting. Mother hugged and kissed Alysia and told her how much she loved her, and Alysia said "I love you too." She did not return Mother's hugs, and she wiped off Mother's kisses, but she smiled and played with Mother.

So, I'm going to order that this matter be remanded back to juvenile court.... Obviously, this child has some issues in getting re-united with her Mother because of the time that's been involved and the matters that have been going on with the various care providers and counselors. I haven't heard all of that yet, but certainly there are some issues there. So, the juvenile court can consider that.

. . . .

So, I think re-unification is appropriate, but there still has to be some work to make that happen.

By order entered August 19, 2011, the circuit court dismissed both petitions for dependency and neglect, set aside the juvenile court's January 21, 2011 order, and reinstated Mother's superior parental rights. The order stated that the juvenile court did not have authority to grant custody to the Mitchells. It also found no clear and convincing evidence of dependence and neglect. The circuit court concluded that "reunification with the Mother is appropriate," and it directed the juvenile court "to consider, prepare, and implement a plan to resolve the pending custody matter with a view toward reunification of the child, Alysia [S.], with her Mother, Kathryn [S.], in a manner that minimizes trauma to said child." The circuit court recalculated Mother's child support obligation and reduced it to $293 per month to be paid until reunification.[7]

On August 10, 2011, which was after the circuit court's oral ruling but nine days before the entry of the written order, the Mitchells filed a petition to terminate Mother's parental rights.[8] The petition was filed in the juvenile court of Rutherford County, before the same juvenile court judge who previously made the finding of dependency and neglect. The petition sought termination of Mother's parental rights so that the Mitchells could adopt Alysia. The petition alleged four grounds for termination: substantial noncompliance with a permanency plan, pursuant to Tennessee Code Annotated section 36–1–113(g)(2); persistent conditions after removal of a child by order of a court for six months, pursuant to subsection (g)(3); failure to make reasonable and consistent payments for the support of a child, pursuant to subsection (g)(9)(A)(ii); and returning the child would pose a risk of substantial harm, pursuant to subsection (g)(9)(A)(v). When the termination petition was filed on August 10, Mother had not made a child support payment in four months and three days. The record con-

---

7. Apparently, the juvenile court had not included Alysia's father's income and his support obligation in its calculation.

8. Mother and Alysia had another supervised visit on July 14, 2011. When Alysia arrived, she said she did not want to visit with Mother. Mrs. Mitchell and the supervisor spoke privately, and Mrs. Mitchell said that Alysia was working with a therapist on expressing herself. According to the supervisor, Mrs. Mitchell said "that if [Alysia] did not want to visit we needed to listen and respect that decision." The supervisor asked to speak to Alysia in private. When he asked Alysia about visiting Mother, Alysia said she was ready and literally ran to the visitation room, where she said, "Mama" and "embraced" Mother. Alysia also said she missed Mother. The supervisor returned to inform Mrs. Mitchell of this development, and Mrs. Mitchell "clearly disagreed" with his actions and claimed that he had ignored Alysia.

The next visit was scheduled for August 11, 2011. When Alysia arrived, she said she did not want to visit. The supervisor said "I really want you to have the visit," and Mrs. Mitchell responded, "you can't say that." Alysia was not required to visit with Mother. While Mother was waiting for the visit, however, a process server attempted to serve her with the termination petition, and the Exchange Club called the police. Alysia missed the September 2011 visit due to illness.

tains no indication that Mother had been advised that failure to make child support payments could result in termination of her parental rights.

On August 22, 2011, Mother filed a motion asking the juvenile court to "consider, prepare and implement a plan to resolve the pending custody matter involving [Alysia] with a view towards reunification of the child with her Mother in a manner that minimizes trauma to the child," consistent with the circuit court's August 19 order. On or about September 19, 2011, the Mitchells appealed the circuit court's order in the dependency and neglect case to the Court of Appeals.

The juvenile court appointed a guardian ad litem for Alysia. On September 30, 2011, the juvenile court held a hearing to determine "how to proceed" based on the circuit court's order requiring reunification (which was on appeal) and the petition for termination filed by the Mitchells. The juvenile court directed the parties and the guardian ad litem to begin the process of selecting a counselor for Alysia. The court ruled that it would consider the recommendations of the counselor in determining how Mother's visitation should be exercised. Pending further orders, the court ruled that Mother would be allowed supervised visitation with Alysia at the Murfreesboro Exchange Club two times per month for a maximum of two hours, at Mother's expense. The court instructed the guardian ad litem to attend the next visit "to address the reluctance of Alysia" to visit.

Mother had her first two-hour supervised visit on October 11, 2011. Alysia separated easily from Mrs. Mitchell and did not hesitate to enter the visitation room. Alysia began interacting with Mother, laughed and smiled as they played, and hugged Mother. Mother used appropriate verbal redirection and instruc-tion with Alysia when necessary and "focused her attention exclusively on Alysia throughout the visit." The next supervised visit occurred for two hours on October 22, 2011. Alysia separated easily from Mrs. Mitchell. She ran to Mother and gave her a hug. She sat in close proximity to Mother as they played, sat in Mother's lap as they read books, and smiled at Mother throughout the visit. Mother was "focused and connected" during the visit and had appropriate conversations with Alysia.

The juvenile court held another hearing on November 3, 2011. The court ruled that Mother would be allowed supervised visits at the Exchange Club every other Saturday for three hours. It also granted Mother a visit on Alysia's upcoming birthday, on December 9. However, the court denied Mother's request for unsupervised parenting time. The juvenile court appointed Dr. Jennifer Hanket to "evaluate Alysia [S.] and Kathryn [S.] to determine what approach should be used to implement the Order" from circuit court. Later that day, after the hearing, Mother and Alysia were scheduled to have another supervised visit at the Murfreesboro Exchange Club, but the visit was cancelled by the Exchange Club when Mother did not arrive early as required by Exchange Club policies. Mother called and reported that she "got turned around in Murfreesboro" after leaving court, and Mrs. Mitchell confirmed that she had spoken with Mother and was aware that she had gotten lost. However, the Exchange Club refused to make an exception to its early arrival policy and rescheduled the visit for the upcoming Saturday.

The rescheduled visit took place on November 5, 2011, for 90 minutes. Alysia separated easily from Mrs. Mitchell and entered the room without hesitation. Alysia hugged Mother and sat in her lap as

they watched a movie. Mother and Alysia played in the floor together throughout the visit. A three-hour supervised visit occurred on November 19, 2011. Alysia appeared at ease by engaging in conversation and playing with Mother. She showed affection by hugging Mother. They played games and had lunch together. Mother asked Alysia about a package she mailed to her recently, but Alysia said she did not receive it.

Mother and Alysia had another three-hour visit on December 3, 2011, but the monitor ended the visit five minutes early. Mother and Alysia laughed and played in the floor as they painted but had a few conversations that the monitor deemed inappropriate. First, Alysia initiated a conversation about her grandmother and cousins, which was impermissible under the Exchange Club's rules, and Mother engaged in the conversation rather than redirecting her. Later, Mother told Alysia how much she loved and missed her and that she cried "happy tears" every day because they were not together. Again, Mother was instructed to change the subject. Finally, five minutes before the visit was supposed to end, Alysia called Mother "Silly Katie," and Mother asked her to call her "Mommy." Alysia began to argue with Mother about this, and the monitor decided to end the visit. Alysia was crying as she was taken from Mother's arms. Mother told Alysia she loved her, and Alysia said she loved Mother too. Alysia "reache[d] out" to hug Mother again but was removed from the room.

On December 9, 2011, Alysia's fifth birthday, she and Mother had a one-hour supervised visit. Alysia was reluctant to leave Mrs. Mitchell and said she did not think visiting was "a good idea." As the supervisor and the guardian ad litem were encouraging Alysia, Mrs. Mitchell remained by the door and was asked to leave three times. She did not encourage or discourage Alysia from visiting. Alysia began to cry and scream for Mrs. Mitchell. After Mrs. Mitchell left, Alysia stopped crying and agreed to visit Mother with "minimal prompting." She "immediately went to [Mother's] arms" and hugged her when she entered the visitation room. Alysia was excited about her birthday cake and the birthday gifts from Mother. Alysia and Mother sat in the floor and played together. Alysia hugged Mother at the end of the visit. The next three-hour visit on December 17 went well. Alysia separated easily from Mrs. Mitchell. Mother and Alysia played and did arts and crafts Mother brought for the visit. Alysia smiled, hugged, and kissed Mother.

The juvenile court held a hearing on December 20, 2011, and Mother orally moved to increase her visitation with a view toward reunification, in accordance with the circuit court's August 19, 2011 order. The juvenile court denied Mother's request for unsupervised parenting time but granted her additional supervised visitation. Beginning January 1, 2012, visits were scheduled every Tuesday for 90 minutes in addition to two Sundays per month for two hours during the months of January and February. Mother was allowed to call Alysia once per week at a specified time.

Mother and Alysia had 90–minute visits on Tuesday, January 3 and January 10, 2012. They smiled, laughed, and played, but Alysia did not return Mother's hugs, and she wiped her face after Mother kissed her. A Sunday visit was scheduled for January 15, 2012, but the visit was cancelled when Mother did not arrive at the appointed time. Mother was contacted by the Exchange Club, and she told them that she "mixed up her Sundays" and thought she had visited the previous Sunday. The records indicate that Mother

was "distressed" and apologetic, and she said she would be present for the upcoming visit that Tuesday. A 90–minute visit took place on Tuesday, January 17. Alysia laughed and played with Mother but did not hug, kiss, or tell Mother she loved her.

On January 18, 2012, the Mitchells filed a motion to modify the visitation schedule. They noted that Mother failed to appear for the January 15 visitation at the Exchange Club and the November 3, 2011 supervised visit (after the court hearing) without prior notice. They acknowledged Mother's explanation that she got "lost" after leaving court on November 3, but they implied that this was untrue because Mother had been to the Exchange Club and to court on previous occasions. The Mitchells also claimed that Mother failed to call Alysia at the appointed time on December 24, 2011, and sent a text message four hours later stating that she forgot. Thus, the Mitchells claimed that the current schedule of visitation and telephone calls was not in Alysia's best interest.[9]

Mother and Alysia visited on January 24 and January 29, 2012. Alysia separated easily from Mrs. Mitchell. Alysia was talkative and responded to Mother's questions. During one visit, Alysia smiled, laughed, and played with Mother outside, and during the other visit, she sat in Mother's lap and hugged Mother "on her back" while watching a movie. She allowed Mother to hug and kiss her but did not return Mother's hugs or respond when Mother said she loved her.

On January 30, 2012, the Mitchells amended their previous motion and sought to "terminate and limit" Mother's visitation and telephone calls. They alleged that during Mother's January 21 telephone call with Alysia, the child informed Mother on more than one occasion that she did not want to talk to Mother, and before Mother hung up the phone, they overheard her say that she "hate[d] those mother-erf* * * * * *." The Mitchells cancelled a visit scheduled for January 31, 2012, due to illness of the child.

At a supervised visit on February 7, 2012, Alysia was reluctant to leave Mrs. Mitchell. Mrs. Mitchell did not encourage or discourage Alysia. However, the visit monitor separated Alysia and Mrs. Mitchell, and the visit proceeded as usual. Alysia and Mother talked, made crafts, and played outside together. During one game, Alysia yelled "Mommy" in reference to Mother. Again, however, Alysia did not return Mother's hugs or respond when Mother told Alysia she loved her. During a February 12 visit, Alysia separated easily from Mrs. Mitchell. She smiled while playing with Mother and hugged Mother upon arriving at the visit, but she did not hug Mother at the end of the visit. Before leaving, Mrs. Mitchell complained that Mother had sent gifts home with Alysia the past couple of visits, and she claimed that a recent court order prohibited Mother from sending gifts home with

---

9. On January 20, 2012, the juvenile court held a hearing on the Mitchells' motion to modify visitation. Because Mother missed the two visits on January 15 and November 3, and did not call at the appointed time on December 24, the court reduced Mother's visitation to "every other weekend for a couple of hours on Saturdays." However, a written order memorializing this decision was not entered until April 11, 2012. Also on April 11, the court entered a "Supplemental Order for Visitation" stating that a previous order failed to include specific dates for visitation and "therefore it is necessary for this Supplemental Order for Visitation be filed." The April 11 Supplemental Order was entered nunc pro tunc to February 14, 2012. Therefore, it is not clear whether the first April 11 order was ever followed by the parties.

Alysia. When Mrs. Mitchell and Alysia arrived for the next visit on February 14, Mrs. Mitchell reiterated that Mother was not supposed to send gifts and movies home with Alysia. The program director quickly interrupted Mrs. Mitchell due to Alysia being present and because of the confrontational and conflictual tone of Mrs. Mitchell's voice. During the visit, Alysia laughed and played with Mother and jumped on her back during a game of hide and seek. She sat in Mother's lap and also wanted a piggyback ride. When Mother told Alysia she loved her, Alysia smiled and said "uh huh."

On February 14, 2012, the juvenile court held a hearing on the Mitchells' motion to terminate and limit Mother's parenting time and phone calls. The court found that Mother exhibited very poor judgment by allowing Alysia to hear profane language during the January 21 telephone call, and therefore, the court reduced Mother's telephone visitation to every other week. The court also reduced Mother's supervised visitation to every other Sunday for two hours. In addition to the every other Sunday visitation, the court set specific visitation times for Mother for Easter, Alysia's spring break, and two other dates. The order provided that Mother could not bring any gifts to her visits with Alysia except during the Easter visit. Subsequently, the juvenile court entered an amended order that eliminated the paragraph about Mother having visitation every other Sunday but retained the provision regarding visitation for Easter, spring break, and the like. However, one portion of the amended order continued to reference "the every other Sunday visitation described above," so it is not clear from the record whether Mother was supposed to have supervised visitation every other Sunday after the entry of this order.[10] Mother and Alysia visited on the two dates specifically mentioned in the order, February 20 and March 8, 2012. Alysia separated easily and entered the visitation room without hesitation. She laughed and played with Mother but did not respond to hugs or say "I love you."

On March 13, 2012, an agreed order was entered that recognized Mother's and the guardian ad litem's concerns that Alysia still had not begun counseling directed at aiding with the reunification effort. The agreed order stated that Alysia's behavior had been digressing and that it was vital that she receive therapy to aid in the reunification effort. The order stated that Dr. Jennifer Hanket would provide therapy to Alysia and testify as necessary in the pending proceedings. The order noted that Mother had been declared indigent and did not have the financial means to pay for the therapy, and it stated that a request for payment would be submitted to the Administrative Office of the Courts.

On March 20, 2012, Mother and Alysia had a 90–minute supervised visit during Alysia's spring break. They laughed and played throughout the visit, and Alysia initiated physical contact with Mother on numerous occasions by asking her to play "airplane" by holding her and twirling her around the room. Alysia did not pull away when Mother hugged her, and Alysia gave Mother a "butterfly kiss."

Alysia began therapy with Dr. Hanket on March 29, 2012. Mother and Alysia visited again on April 6, 2012, for Easter.

**10.** Mother and Alysia did complete supervised visits on the four specific dates referenced in the order, for Easter, Spring Break, and the two other days. However, no other visits took place at the Exchange Club thereafter.

Mother would later testify that the judge "set no more up after that." At some point, the Murfreesboro Exchange Club also stopped offering the service of supervising visitation.

They decorated and hid eggs and had lunch together. At the end of the visit, Alysia hugged Mother and told her she loved her. Unfortunately, this was Alysia's last visit with Mother for several months. A May 18 record from the Exchange Club indicates that the program director contacted the guardian ad litem to determine the status of Mother's visitation, and the guardian ad litem reported that Mother was to have "no contact" with Alysia until Alysia's therapist said it was "ok." According to the Exchange Club record, Alysia did not want to see Mother, and Dr. Hanket told the court that Alysia's wish should be "honored for various psychological reasons." The guardian ad litem informed the Exchange Club that she did not anticipate any more visits for several months, as the trial on the Mitchells' termination petition was set for December 2012.

Several months later, on September 4, 2012, the guardian ad litem filed a "Motion for Reinstatement of Mother's Visitation."[11] According to the motion, Dr. Hanket believed that it was in the best interest of the child for visitation with Mother to immediately be reinstated and to occur twice monthly for three hours per visit. The motion noted there were "no security concerns" for Alysia's safety when visiting Mother. Because of the lack of safety concerns, and because visits at the Exchange Club "went well," Dr. Hanket recommended transferring the supervision of visits to another program that would provide "a more natural setting" for visits. Following a hearing on November 26, 2012, an agreed order was entered setting

forth the parties' agreement that Betsy Crow, "a licensed attorney with specialized guardian ad litem training," would supervise visitation "due to the absence of supervised visitation providers." The agreed order provided that Dr. Hanket would set the parameters of the supervised visitation such as location, frequency, and the length of the visits. All costs of the supervised visitation were to be paid by Mother. Mother was permitted telephone contact with Alysia every other Monday.

The first visit supervised by Ms. Crow took place on December 5, 2012, at a church in a preschool classroom. Dr. Hanket attended the visit as well. According to Ms. Crow's report, Alysia smiled at Mother when she walked in but took about 30 minutes to "warm up" to her. Once they started interacting, Alysia seemed comfortable with Mother. She repeatedly ran to Mother and allowed Mother to lift her as if she was an airplane. Alysia "loved the game and laughed a great deal" and also allowed Mother to tickle her. Alysia styled Mother's hair in a ponytail and again seemed comfortable with the physical interaction. After this, "[t]he visit seemed to turn more positive and interactive." Alysia moved close to Mother and leaned against her as she played with Mother's phone. Mother told Alysia she missed her and Alysia said, "I missed you too." To celebrate Alysia's sixth birthday the following week, Alysia opened birthday gifts from Mother and ate cupcakes. When Mother and Alysia were told that the visit would end in fifteen minutes, Alysia immediately packed up her belongings, but then she turned to Mother and asked

---

11. Also during these proceedings, the Mitchells filed a petition for contempt against Mother for failure to pay child support and asked the trial court to incarcerate Mother for thirty days. The petition alleged that Mother failed to pay child support for three months while the termination petition was pending. Because the contempt proceeding involved a time period outside the four-month time frame that governs our analysis in this case and because it has not been raised as an issue on appeal, we will not discuss the contempt proceeding further in this opinion.

if they could play longer. Alysia wanted to climb on Mother's shoulder and said she remembered doing that with Mother in the past. When Mother mentioned that it had been a long time since she had seen Alysia, the child asked, "Why did it take that long?" At the end of the visit, Mother asked for a hug, but Alysia did not respond and appeared uncomfortable. Overall, Ms. Crow described the visit as "positive" and said that the interactions were appropriate. Ms. Crow believed that the visit actually went "very well," considering that several months had elapsed since Mother's last visit. However, Ms. Crow said she was "taken aback" when she realized that Alysia wore a necklace to the visit that read, "I love my mommy and daddy." Ms. Crow considered this to be inappropriate under the circumstances and discussed the issue with the guardian ad litem.

On December 17, 2012, Mother and Alysia had a supervised visit with Ms. Crow at a bowling alley. Prior to the visit, Alysia told Ms. Crow that her parents told her that she would not get in trouble for visiting Mother. She then stated that she was supposed to be careful of "bad people." Alysia said Mother was a bad person because Mother used to spank her. During the visit, Alysia and Mother bowled, and Alysia laughed and yelled "go Kathryn" when it was Mother's turn to bowl. They had dinner there and engaged in appropriate conversation. They sang Christmas songs and danced. When it was time to leave, Mother picked up Alysia to hug her, and Alysia squirmed away and ran to a corner. She would not respond to Mother thereafter. Ms. Crow described this interaction as "disturbing" to Alysia and "upsetting" to Mother. Still, though, she considered the overall nature of the visit as "positive" and said that it went "very well," as everyone appeared to have a good time. Ms. Crow said she and Alysia were

discussing the visit afterward, until the Mitchells arrived, and then Alysia "immediately said, 'I don't want to talk about it.'" Alysia then told the Mitchells that "she didn't want to have to talk about this when they left because it would give her nightmares."

The next visit supervised by Ms. Crow occurred at a "discovery center" in Murfreesboro on January 9, 2013. Alysia said hello to Mother and seemed eager to play. Alysia laughed a lot and seemed very engaged with Mother. According to Ms. Crow, Mother "did a good job generally 'parenting' Alysia" during the visit and demonstrated "appropriate and effective parenting" when redirecting Alysia. Mother was instructed to let Alysia initiate physical contact, and she was "very cooperative" in response to the suggestion. Alysia did initiate physical contact several times by taking Mother's hand and guiding her to things, moving closer to Mother, sitting in her lap, and placing her hand on Mother's arm. About ten minutes before the visit ended, Alysia used her "safe sign" and told Ms. Crow she was ready to go. Ms. Crow said she would call the Mitchells, but Alysia told her to wait and returned to playing with Mother. When the visit ended, Mother told Alysia she loved her, and Alysia replied, "I love you too," but then she covered her mouth and said, "no I don't." Ms. Crow described Alysia's initial response as a "reflex" and believed that Alysia regretted saying it because she appeared "a little distressed."

The final visit supervised by Ms. Crow occurred on January 26, 2013. Alysia greeted Mother by saying hello and at first seemed a little uncomfortable. Mother and Alysia began jumping in a bounce house together and then skated together for the rest of the visit. With 15 minutes left in the visit, Alysia used her safe sign and said she was ready to go. When Ms.

Crow asked if anything happened, Alysia said no and that this was the "best visit I have had with her." She said she wanted to leave because she was going bike riding with her parents. Alysia then went to play a video game with Mother, and they played until the end of the visit. Mother asked for a high-five when Alysia left, but Alysia declined. Ms. Crow was of the opinion that all of the visits she supervised were positive but said that this one went "exceptionally well." According to Ms. Crow, Mother was very respectful and co-operative during the visits, she followed every instruction Ms. Crow gave her, she arrived and departed at the appointed times, and Ms. Crow "never saw anything inappropriate" from Mother.

At a hearing on January 28, 2013, the parties announced their agreement to have future visitation supervised by the Kymari House. The first visit supervised by the Kymari House took place at a children's activity center in Smyrna, Tennessee, on March 9, 2013. When the supervisor met with Alysia prior to the visit, Alysia was hesitant and said she did not want to visit Mother. The supervisor asked her to try it for a few minutes, and Alysia agreed. Alysia and Mother talked about Alysia losing a tooth, then they played outside together and painted. When it was time to leave, Mother told Alysia she loved her. Alysia said, "I love you ... wait a minute," then said "Bye" and walked to the door. The supervisor felt that the transition period before and after the visit was "challenging" for Alysia. Overall, however, he thought the visit went well, as Alysia responded to Mother and interacted with her. For reasons discussed below, this was the final visit Mother and Alysia had.

The next week, on March 15, 2013, Dr. Hanket was deposed. During the deposition, Dr. Hanket estimated that it would take 18 to 24 months to successfully reuni-fy Mother and Alysia, but perhaps less depending on the child's reaction to reunification. Dr. Hanket also testified that if visitation did not start to improve, reunification with Mother would be less likely.

The next visit was scheduled for March 23, 2013, at the Kymari House. Alysia refused to enter the building. She stepped out of the Mitchells' vehicle and spoke with the supervisor, who asked Alysia to participate several times, but she continued to refuse. The visit never took place because it was the policy of the Kymari House to "not force" a child to visit. The visit supervisor said he did not try to convince Alysia that she "should" visit Mother; he simply tried to assure her that she would be in a safe and comfortable environment. The supervisor did not hear the Mitchells make any comments. At the next two visits on April 1 and April 20, 2013, Alysia again refused to enter the building. She told the supervisor that Mother lied and was mean to her. Alysia insisted that she did not want to visit and said "that's never going to change." The guardian ad litem suggested asking the Mitchells to leave the premises to see if Alysia would visit with Mother after they left, but the Kymari House refused to implement this suggestion. The Kymari House refused to schedule any further visits because of Alysia's refusal to participate.

On April 11, 2013, this Court issued its opinion in the Mitchells' appeal of the circuit court's decision to dismiss the petition for dependency and neglect. *See In re Alysia M.S.*, No. M2011–02008–COA–R3–JV, 2013 WL 1501710, at *7 (Tenn.Ct.App. Apr. 11, 2013). We reviewed the evidence the Mitchells presented before the circuit court regarding the alleged sexual abuse by Alysia's half-sister, the allegedly immoral postings from Mother's social networking pages, Mother's history of unstable housing and employment, and Mother's

use of marijuana in the past. We concluded that the evidence pertaining to these issues did not rise to the level of clear and convincing evidence of dependency and neglect. Accordingly, we affirmed the circuit court's decision to dismiss the petition for dependency and neglect.

The trial on the Mitchells' petition to terminate Mother's parental rights began on May 10, 2013, and was tried over the course of six days. The juvenile court heard testimony from Mother, Mr. and Mrs. Mitchell, the DCS caseworker who was assigned to Mother's case in 2010, Alysia's former therapist from the sexual assault center, Alysia's current therapist (Dr. Hanket), another therapist who counseled Alysia's half-sister, the visitation supervisor from the Kymari House, attorney Betsy Crow, Mother's husband, Mother's mother and father, Mother's former attorney, and his paralegal. The parties also introduced several volumes of testimony from the juvenile and circuit court dependency and neglect proceedings.

By the time of trial, Alysia had been living with the Mitchells for about two years and eleven months. She was six years old. Mother had remarried and was expecting twins. She had maintained steady employment for eighteen months. She worked at a restaurant for one year and then went to work at a gas station, where she remained employed at the time of trial. Mother testified that she had been living at her current residence for about 18 months and that she and her husband could financially provide for Alysia. They lived in a trailer home on a two-acre property owned by his family.

Mother testified that she had attempted to comply with the plan entered by DCS by stabilizing her home and employment situation and becoming drug-free. Mother testified that she had not used drugs in nearly three years. Mother had complet-ed two alcohol and drug assessments, at her own expense, and she had been attending weekly "celebrate recovery" meetings for the past three years. Mother's most recent drug and alcohol assessment found that she had a low probability of a substance abuse disorder and that no treatment was needed. Nevertheless, Mother voluntarily enrolled in several classes at the intervention facility where she was assessed, including a 12–step alcohol and drug program, a 24–step female domestic violence program, and a 10–step parenting program, and she completed all of these programs. Mother also completed an eight to ten hour parenting class at a state university on her own accord.

The caseworker from DCS, Shirley Reed, testified about DCS's involvement with Mother and Alysia. She stated at the outset that she had not been in contact with Mother in about three years. She emphasized that DCS never removed Alysia from Mother's care and said that it had no grounds to do so. She testified that she and/or another DCS worker visited three residences where Mother lived, and they were all suitable homes with no concerns. Ms. Reed was asked if there was ever "any reason why the child could not have lived with [Mother]" throughout DCS's involvement in the case, and Ms. Reed responded, "No." Ms. Reed described the "non-custodial" plan signed by Mother and Charlene at the initial meeting with DCS in June 2010. She testified that it was her understanding, from that initial meeting, that Alysia was staying with Charlene and that she would be returning to Charlene's house after she finished church camp. She said, "for the longest of times, we thought [Alysia] was with Charlene," but later they discovered she was actually staying with the Mitchells. Ms. Reed testified that Mother called DCS stating that she wanted Alysia returned to

her. Ms. Reed said that a DCS supervisor, who was not familiar with the situation, advised Mother to wait until Ms. Reed got "back to the office." Ms. Reed was also aware that Mother attempted to get help from the police. Ms. Reed testified that she informed Mrs. Mitchell by telephone that DCS did not have custody of the child and did not have any restrictions keeping Alysia from her mother. Mrs. Mitchell informed Ms. Reed that she and her husband intended to pursue custody of Alysia, and Ms. Reed told Mrs. Mitchell that "basically they were taking her child from her unnecessarily."

Ms. Reed testified that Mother worked with DCS and "was doing what we had asked her to do." She was of the opinion that Mother had a stable home with no concerns. She said Mother took every drug screen that DCS requested and passed both follow-up drug screens. She noted that Mother completed a drug assessment at her own expense. Ms. Reed testified that DCS closed its case completely when the Mitchells were awarded temporary custody of Alysia around October of 2010. Ms. Reed said that DCS was "totally out of the case" from that point forward and that the permanency plan was rendered "null," ending Mother's responsibility to meet its goals. However, she said that Mother "had done—pretty much following what we had asked her to do" prior to DCS closing the case. Ms. Reed was a member of the child protective investigative team that investigated the allegation of sexual abuse by Alysia's half-sister, and she said the team classified the allegation as unfounded and determined that no follow-up services were necessary. She said the forensic interviewers who interviewed

Alysia and her half-sister were "specialists in that field." The therapist who treated Alysia's half-sister testified that she saw the child for three sessions, and the half-sister appeared to be a happy, normal, well-adjusted child with no concerning issues.[12]

Lori Myers, the licensed clinical social worker and "registered play therapist" who counseled Alysia at the sexual assault center, also testified. The Mitchells initially took Alysia to the sexual assault center in September 2010, soon after they reported to DCS that Alysia said her half-sister "licked her bootie." Again, Alysia was three years old at the time. Ms. Myers testified that she saw Alysia one to two times per month, with a few breaks from therapy, until February 2012, for a total of 37 sessions. Ms. Myers acknowledged that she does not interview children to determine whether they have been the victims of abuse and said that would be the role of forensic interviewers. She testified that she could not say whether the alleged sexual abuse in this case did or did not happen. However, because Alysia made a disclosure of her sister touching her private parts, Ms. Myers counseled Alysia about safe and unsafe touching and ways to be assertive. Ms. Myers testified that she observed increased behavioral issues and anxiety-related behavior, such as aggression, from Alysia around times of increased visitation. Ms. Myers talked with Alysia about judges and attorneys and told her that sometimes adults are responsible for making decisions for children. Ms. Myers told Alysia that she was living with the Mitchells "because that was where all the individuals had decided was the safest place for her at this time." When asked

---

12. The therapist worked at a child advocacy center and "99 percent" of her work was on child sexual abuse cases. However, she acknowledged that it was not her role to con-

duct a forensic interview of the half-sister in order to determine whether abuse had in fact occurred.

about Alysia's recent refusal to visit Mother, Ms. Myers said she taught Alysia that she had a right to state her thoughts and feelings, but that she should also be respectful of adults and their decisions. Ms. Myers never worked with Alysia on issues pertaining to reunification with Mother. Ms. Myers ended her therapy with Alysia when Alysia began seeing Dr. Hanket for counseling regarding reunification.

Dr. Hanket is a licensed clinical psychologist in private practice. Her first session with Alysia was March 29, 2012, just days before Alysia's last visit with Mother at the Exchange Club. Dr. Hanket met with Alysia 21 times and described her as a sweet, bubbly, and very happy child. She said when Alysia talked about Mother she would reflect ambivalence, anger, or sadness. Dr. Hanket and Alysia discussed Mother missing telephone calls and Alysia's anger pertaining to that issue. According to Dr. Hanket, Alysia said Mother was mean to her because she used to spank her all the time. However, Dr. Hanket did not consider the spanking Alysia described to have been inappropriate in any way.[13]

Dr. Hanket also met with Mother six to eight times. She said Mother followed her recommendations and did everything that was asked of her. She said Mother "has not given me any cause for concern." Dr. Hanket never met with Mother and Alysia together in her office, but she did supervise one visit with attorney Betsy Crow on December 5, 2012, when visitation resumed months after the visits at the Exchange Club ended. She described the visit much like Ms. Crow did in her notes. She said Alysia took about 30 minutes to warm up to Mother. After that period, they played together and shared a snack,

Alysia styled Mother's hair, and they appeared to have fun together and interact in a loving manner. Dr. Hanket's notes reflected that Mother was good at finding activities to do with Alysia, she responded appropriately when the Mitchells were mentioned, and she exhibited good parenting skills. During the visit, Alysia told Mother she missed her and asked why it took so long for them to be able to visit. Near the end of the visit, Alysia said, "Let's get a few more minutes together." Before leaving, Alysia "again became very detached" and would not return Mother's hug and she "automatically" said "I love you" in response to Mother saying it. Dr. Hanket said Alysia "showed a lot of disturbances about having said that to [Mother]" during her next therapy session. Specifically, Alysia claimed she lied when she told Mother she missed her and loved her, and she was afraid she would be in trouble for telling a lie. Dr. Hanket testified, "my thoughts were that she feels torn. She feels as though she has to choose one party over the other. And that certainly would be anxiety-provoking for anybody."

Dr. Hanket was aware that Alysia began refusing to visit with Mother on March 23, 2013, about six weeks before the termination trial began. This was eight days after Dr. Hanket gave her deposition in this case and testified that reunification would be unlikely if visits did not go well. (Mrs. Mitchell was present at the deposition.) Dr. Hanket said she "[did] find that odd" that Alysia consistently participated in visits with Mother prior to the deposition and stopped immediately thereafter. At a session with Dr. Hanket on March 26, Alysia was unusually excited and "proud" of the fact that she had told the visit supervisor she did not want to visit with

---

13. *Alysia said Mother spanked her with an open hand, and according to Dr. Hanket, Alysia "denied that the spanking left any* bruises or marks or pain for an extended period of time."

Mother and was not required to visit. Dr. Hanket recalled discussing the situation with the guardian ad litem and advising her that Alysia should not be forced to visit because she feared that it "would really set her back a number of steps in terms of her feeling that empowerment." Dr. Hanket also said, however, that a child should not be the ultimate decision maker in this case.

Around this time, Alysia also started to exhibit behavioral problems at home and at school. During Dr. Hanket's last visit with Alysia, on April 23, she observed "a dramatic change" in Alysia. Alysia was disobedient, "very hyper, very upset, just couldn't control herself, couldn't calm herself down, she was throwing toys at me, things she had never done before." Dr. Hanket asked Alysia if she was upset about not seeing Mother, and Alysia responded, "Why would I feel that way?" However, Dr. Hanket was very concerned that Alysia actually felt torn. Dr. Hanket acknowledged the possibility that Alysia loves Mother and also loves the Mitchells. Dr. Hanket said, "I believe she has some type of allegiance or feeling for her mother still at this time." Alysia had another session scheduled with Dr. Hanket on May 7, just three days before trial began, but she did not appear for the appointment.

Dr. Hanket acknowledged her previous estimation, during her deposition, that reunification of Alysia and Mother would probably take between 18 and 24 months. Because of Alysia's subsequent refusal to visit, Dr. Hanket's current estimation as to a timeline for reunification was "closer to certainly the 24–month mark if not even longer than that." She said it would be a "long process" and that Alysia would have to "buy-in" to make it successful. Dr.

Hanket acknowledged the possibility that reunification "would never happen successfully." She said "reunification becomes increasingly difficult the longer this goes on" and that it could take two more years "if we do it the way I want to[.]" Dr. Hanket opined that it would be traumatic to Alysia if she was simply "torn away" from the Mitchells without a very slow approach. On the other hand, she testified that it would not be in Alysia's best interest "to continue floating like this" for the next few years. Dr. Hanket said that introducing Alysia to Mother's current husband could present additional issues, but on the other hand, it could also benefit Alysia and Mother to have a male figure in the home. Dr. Hanket testified that the half-sister's frequent presence in the home would also impact Alysia's ability to feel safe and secure.

Dr. Hanket initially said that she had not seen any evidence of coaching in this case. However, she later conceded that she had expressed several concerns to the guardian ad litem about possible coaching.[14] One such issue involved Alysia telling Dr. Hanket that the Mitchells made her call them "mommy" and "daddy." Dr. Hanket said, "Alysia told me that she was—and she used the word 'forced' to call the Mitchells 'mommy' and 'daddy.'" Dr. Hanket said that this could be a form of coaching. When asked if there were other forms of coaching that concerned her, Dr. Hanket described an incident when Alysia was discussing Mother missing a telephone call, and she said, "Katie lied." Dr. Hanket asked Alysia how she knew that Katie lied, and "[Alysia] stated that the Mitchells had told her that Katie lied." Dr. Hanket acknowledged that telling the child that Mother lied could impede reunification.

14. Dr. Hanket and the guardian ad litem even discussed the possibility of moving Alysia into foster care if they could prove that the Mitch-

ells were coaching her, but Dr. Hanket did not feel that "it rose to that level."

Dr. Hanket also said that if the Mitchells were not ensuring that Alysia received the letters and packages Mother sent, that could be another instance of building a barrier to reunification.[15]

In addition, Dr. Hanket acknowledged that Alysia's decision making process could have been influenced by such things as the vacations she takes with the Mitchells and the material things they are able to provide financially. She said, "one of the issues related to reunification is that Alysia is having to go potentially in between very different environments. There are things that she's able to enjoy with Mr. and Ms. Mitchell that she may not be able to enjoy with [Mother]. And that is certainly something." Dr. Hanket said there is "a difference for [Alysia] in terms of environments and what each set of parents is able to provide for her. And I think for her, that's an issue." She also acknowledged that the Mitchells refusal to spank Alysia could sway her decision. In fact, during one of their last sessions, Dr. Hanket and Alysia discussed that Alysia would eventually live either with the Mitchells or with Mother; Alysia said her life with the Mitchells was better because of her "beautiful clothes," and her life with Mother was worse because Mother spanked her.[16]

Finally, Dr. Hanket acknowledged her deposition testimony, given less than two months before trial, about her opinion as to terminating Mother's parental rights:

Q. Our trial date is May the 10th. Okay?

A. Okay.

Q. And the gravity of the situation is a mother, her parental rights are on the line here. There's no going back. Once they're terminated, they're terminated. Of course, there can be an appeal. But I'm saying on date, they're terminated. There is no more reunification. There's no more plans. There's no more therapy to work towards reunification. Are you going to be prepared that day to give an opinion that [Mother] never sees her daughter again, never works towards reunification again, and I think you said have family therapy and counseling all working together. None of that will be possible that day. Her rights are terminated at the end of this trial. It's over with. I think [the guardian ad litem] is asking you, are you prepared to do that—testify to that that day? I just want to quantify that question.

A. I did not—it was not my understanding that that was what court in May was for. So, no, because—no. Because we won't have had a chance to give it everything we've got. I hate to say that, because I hate that this has gone on for Alysia for three years and now it may go on howev-

---

15. Dr. Hanket also said there "was an issue" regarding whether Mr. and Mrs. Mitchell had possibly "coached [Alysia] into making that allegation" of sexual abuse regarding her half-sister. Dr. Hanket said Alysia continually stated that "she told them; they did not tell her." But, Dr. Hanket said that Alysia would not "open up" about the accusation or go into detail with her.

16. Dr. Hanket said Alysia's discussion of spanking was a recurrent theme during their therapy, and her description of Mother spanking her "all the time" did not seem realistic. Alysia also told Dr. Hanket that her father spanked her all the time. Dr. Hanket tried to "dig deeper" but "was never able to get past just that she was spanked all the time." Dr. Hanket was asked whether this raised a "red flag" for her and suggested that, perhaps, someone was telling Alysia that she was spanked. She replied, "I mean, that's certainly partly why I kept coming back to it."

er many more. But if—yeah. I mean, if I'm going to have to testify to potentially terminate rights in May, no, I will not be ready to do that.

Due to Alysia's subsequent refusal to visit, Dr. Hanket testified that the only option she could envision for resuming Mother's visitation would be if Alysia was forced to visit, and Dr. Hanket had "pretty significant concerns with doing that." When asked if this would be similar to forcing a child to attend a practice or church event, Dr. Hanket said the difference here is that Alysia apparently does not feel "emotionally safe" with Mother, for whatever reason. She noted that Mother's attempts to elicit affection from Alysia made the child "very uncomfortable" but also recognized that Mother had "correct[ed]" and "remedied" that issue during the supervised visits after a discussion with Ms. Crow.

Much of the testimony at trial centered on whether Mother willfully failed to support Alysia during the four months immediately preceding the filing of the termination petition on August 10, 2011.[17] Mother admitted that she did not make a monetary child support payment to the Mitchells during that four-month period, which spanned from April 10 until August 9.[18] Mother's last child support payment prior to the four month period was on April 7, 2011, in the amount of $200. Mother testified that she was working at a temporary staffing agency during the relevant time period and that she accepted every job she was offered through the agency.

Mother testified that she worked, through the staffing agency, from March 27 until May 10 at a lighting factory, making $9.00 to $9.25 an hour for 30 to 38 hours per week. Mother testified that the staffing agency "held back" her first paycheck from her employment, and then she received a paycheck every other week. She said she did not use any of the funds from her employment at the factory to pay child support because she was "so far behind" on her bills. Mother had been employed only sporadically since Alysia left in June 2010. Mother testified that she did not receive a paycheck during the entire month of June 2011. She testified that her next job lasted about one week, from June 27 until July 1, and it was also through the staffing agency. At this job, Mother worked at another factory spraying bathtubs with fiberglass. She worked approximately thirty hours and earned $7.25 per hour. Mother testified that she used her paycheck from this employment to pay bills that were past due, and she also used some of the money to buy school clothes for Alysia. She testified that she sent Alysia three to four outfits, shoes, socks, underwear, and vitamins. Mother did not have another job during the month of July. Mother's next job began on August 8, just two days before the termination petition was filed, and it lasted until September 5. This job was also through the staffing agency, so she did not receive a paycheck for this work during the four-month period. Mother initially testified that this job was at a clothing factory, but when she

17. In their briefs on appeal and during oral argument, the parties stated that the termination petition was filed on August 22. From our review of the record, however, it appears that the termination petition was stamped as filed on August 10, and the trial court's letter ruling confirms that the petition was filed on August 10. The parties' confusion may have arisen due to the fact that the table of contents in the technical record reflects that the petition was filed on August 22.

18. We note that the circuit court trial on the dependency and neglect petition was held over the course of four days between April and June 2011.

was asked to list her employment history again, later in the trial, she testified that she worked on these dates at a factory called "Rio," and that she had been unable to remember the name of the factory when she testified "the other day."

Mother testified that she began sending gifts and letters to Alysia soon after Alysia went to stay with Charlene. According to Mother, she asked the Mitchells about sending school supplies for Alysia, and the Mitchells told her they would take care of it. She said the Mitchells also told her, when the court proceedings began, that there was no need to send them child support payments and that she should use the money to pay for the cost of supervised visitation. Mr. Mitchell testified that he did tell Mother at the initial probable cause hearing in juvenile court that he and his wife did not need Mother's child support and that "we wanted her to keep that, apply it to her visits, use it to get her life back on track." Mrs. Mitchell similarly testified that she and her husband told Mother that they did not need or want money from Mother because they could support Alysia without it, and they wanted Mother to use it for the cost of supervised visitation.[19]

Despite these instructions, Mother testified that she sent packages containing clothing and other items through the mail to the Mitchells' post office box and with the guardian ad litem whenever it was permitted. According to Mother, when she would ask Alysia about items that were sent, Alysia would say that she did not receive them. Mother testified that the post office returned some of the items she sent as unclaimed, and she introduced as exhibits two of the unclaimed parcels reflecting numerous dates of attempted delivery. Mother testified that the items she sent over the years included gifts, cards, pictures, clothing, personal effects, toys, Christmas gifts, Easter dresses, Valentine's Day gifts, school supplies, underwear, shampoo, and vitamins. Mrs. Mitchell testified at trial that she set up the post office box specifically for receipt of Mother's packages and mail. She acknowledged receiving various packages, cards, and letters from Mother over the years. However, with regard to the unclaimed packages, Mrs. Mitchell said that she did not check the post office box regularly and that Mother was supposed to send her a text message when she needed to check it.

Mother conceded that she missed a few phone calls with Alysia but claimed that it was because of work meetings and the fact that she could not have a phone at work. Mother acknowledged that she and Alysia do not have conversations when she calls. Instead, Mother asks Alysia numerous questions hoping to get a response, and Alysia repeats, "I don't want to talk to you. I don't want to talk to you. I don't want to talk to you." She said Alysia did talk with her on the phone "a little bit" in 2011, but since then, Alysia had consistently stated that she did not want to speak to Mother. Mother acknowledged that Alysia did not want to come to their last three supervised visits, but she claimed that all of the previous visits went well. When Mother was asked about Alysia being in a stable home with the Mitchells for the past three years, she said, "That's because the legal procedures have taken that long. It's not because I haven't fought for her that long." She said she was willing to do "whatever it takes" to be reunited with Alysia. Mother believed that she could be reunited with Alysia but said that it would require hard work, consistency, therapy, and cooperation. Mother expressed her opinion that the juvenile court should have

---

19. Mr. Mitchell earned a six-figure salary, and the Mitchells had no children.

allowed Alysia to see her family, come to Mother's home, or at least have visitation in some type of home environment. Mother also testified that she asked Dr. Hanket on numerous occasions to meet with her and Alysia together for some type of joint therapy, and yet that never occurred.

Mother's current husband ("Husband") also testified. He said he had been working at Rio, which he described as an ammunition factory, for about four years. During cross-examination by the Mitchells' attorney, Husband was asked whether Mother worked at Rio during the same time that Husband worked there. Husband said she did. When asked how long Mother worked at Rio, he responded, "Maybe four months, five months.... Could have been longer."[20] Counsel for the Mitchells asked if this employment occurred in and around the middle of 2011, and Husband said he could not remember. When asked about Mother's periods of unemployment, he said he did not "keep up with time and stuff like that." Husband testified that he thought Mother moved into his trailer two to three years ago or "somewhere around in that area."

Mother's mother was asked about Mother's employment situation during the spring and summer of 2011, and she said that Mother had a hard time finding a job and meeting her expenses during that period. During cross-examination by the Mitchells' counsel, the following exchange occurred:

Q. And in the spring and summer of 2011, that's when your daughter was working at Rio for about four months. Correct?

A. I don't know exactly when it was she worked there. I know she worked at Rio, but I couldn't tell you—I lose track, so—

Q. She worked there for many months—at least a few months, not many months.

A. I know she worked there, yes.

Q. So four or five, if that's what her husband testified to, that would be approximately to the best of your knowledge. Correct?

A. Well, yeah.

Q. Do you know why your daughter would have come to court and said she only worked at Rio for one month?

A. No.

On re-direct, Mother's mother was asked:

Q. In the summer of 2010—or summer of 2011, the spring of 2011, if [Mother] testified that she worked at Rio a month, would that not be more accurate than what Mr. Edwards testified to?

A. It could be. Like I said, I'm not sure how long she worked there. I do know she worked there though.

Q. You don't know how long she worked there?

A. Oh, I have no—I don't. I can't remember how long she had worked there for.

When Mother's father was asked about Mother's employment situation in the spring and summer of 2011, he said Mother "couldn't find nothing nowhere" because "[t]he economy and everything was doing so bad in our area that temporary services, nobody had nothing available." He remembered that Mother worked at Rio through the temporary employment service at some point, and he estimated that she worked there "[a]bout two or three months maybe." When asked if that em-

---

**20.** As discussed earlier in this opinion, Mother testified that she worked at Rio through the staffing agency from August 8 until September 5, 2011.

ployment would have been "about the spring/summer of 2011," he said, "Yes, it would be."

Mother's father acknowledged that he complained to DCS about Mother's living situation in June 2010 and later filed the intervening petition for dependency and neglect.[21] However, he said that he and Mother had since reconciled their differences, and Mother had corrected her circumstances by establishing a stable home and employment and becoming drug-free.

The trial court entered a written order on October 23, 2013, incorporating by reference a letter ruling sent by the judge to the attorneys. The letter ruling set forth the four grounds for termination alleged in the Mitchells' petition: substantial non-compliance with a permanency plan, pursuant to Tennessee Code Annotated section 36–1–113(g)(2); persistent conditions, pursuant to subsection (g)(3); failure to support, pursuant to subsection (g)(9)(A)(ii); and returning the child to the parent would pose a risk of substantial harm to the physical or psychological welfare of the child, pursuant to subsection (g)(9)(A)(v). However, when ruling on grounds for termination, the court only addressed two issues: "abandonment by failure to support" pursuant to subsection (g)(1) and persistent conditions pursuant to subsection (g)(3). The juvenile court found that both of these grounds for termination were proven by clear and convincing evidence. The court then continued with a best interest analysis and determined by clear and convincing evidence that it was in the best interest of Alysia to terminate Mother's parental rights. The order granted full guardianship rights to the Mitchells and provided that they "may

proceed in seeking adoption of the minor child to allow the child the permanency she so greatly deserves." The written order stated that "any and all remaining claims of the parties unless specifically addressed herein are dismissed with prejudiced [sic] to make this a Final Order permitting Petitioners to immediately adopt said child." Mother timely filed a notice of appeal.

## II. ISSUES PRESENTED

Mother frames the issue on appeal simply as whether the trial court erred in finding that her parental rights should be terminated. Similarly, the Mitchells state the issue as whether the trial court properly terminated Mother's parental rights. For the following reasons, we reverse the decision of the juvenile court and remand for the entry of an order that implements a plan to expeditiously reunite Alysia with her mother.

## III. STANDARD OF REVIEW

██ "A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions." *In re J.C.D.*, 254 S.W.3d 432, 437 (Tenn.Ct.App.2007); *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn.Ct. App.2005). Although the parent's right is fundamental and superior to the claims of other persons and the government, it is not absolute. *In re J.C.D.*, 254 S.W.3d at 437. A parent's right "continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or

---

**21.** As noted above, Alysia's half-sister went to live with Mother's parents in June 2010, when Alysia went to stay with Charlene. Mother's parents adopted the half-sister, but by the time of trial, the half-sister was staying with Mother and her husband every weekend and during the week when Mother was off work.

termination." *Id.*; *see also In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn.Ct.App.2004).

 In Tennessee, proceedings to terminate a parent's parental rights are governed by statute. "Parties who have standing to seek the termination of a biological parent's parental rights must prove two things." *In re Audrey S.*, 182 S.W.3d at 860; *see also In re M.J.B.*, 140 S.W.3d at 653. First, they must prove the existence of at least one of the statutory grounds for termination, which are listed in Tennessee Code Annotated section 36–1–113(g). *Id.* Several grounds for termination are listed in subsection (g), but the existence of any one of the grounds enumerated in the statute will support a decision to terminate parental rights. *In re Angela E.*, 303 S.W.3d 240, 251 (Tenn. 2010); *In re S.R.C.*, 156 S.W.3d 26, 28 (Tenn.Ct.App.2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn.Ct.App.2004). Second, the petitioner must prove that terminating parental rights is in the child's best interest, considering, among other things, the factors listed in Tennessee Code Annotated section 36–1–113(i). *In re Audrey S.*, 182 S.W.3d at 860. In light of the constitutional dimension of the rights at stake in a termination proceeding, the person seeking to terminate these rights must prove all the elements of the case by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn.2010) (citing Tenn.Code Ann. § 36–1–113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808–09 (Tenn.2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn.2002)). In sum, in order to terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termi-

nation, but also that termination is in the child's best interest. *In re Adoption of Angela E.*, 402 S.W.3d 636, 639 (Tenn. 2013); *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn.2006).

 Because of this heightened burden of proof in parental termination cases, on appeal we must adapt our customary standard of review as set forth in Tennessee Rule of Appellate Procedure 13(d). *In re Audrey S.*, 182 S.W.3d at 861. First, we review each of the trial court's specific factual findings *de novo* in accordance with Rule 13(d), presuming the finding to be correct unless the evidence preponderates against it. *In re Adoption of Angela E.*, 402 S.W.3d at 639. Second, we must determine whether the facts (either as found by the trial court or as supported by the preponderance of the evidence) amount to clear and convincing evidence that one of the statutory grounds for termination exists. *Id.* at 639–40. Whether a statutory ground has been proven by the requisite standard of evidence is a question of law to be reviewed *de novo* with no presumption of correctness. *In re R.L.F.*, 278 S.W.3d 305, 312 (Tenn.Ct.App.2008) (citing *In re B.T.*, No. M2007–01607–COA–R3–PT, 2008 WL 276012, at *2 (Tenn.Ct.App. Jan. 31, 2008)).

## IV. Discussion

### A. Grounds for Termination

#### 1. Willful Failure to Support

 The Mitchells' petition to terminate parental rights alleged "[t]hat Mother has failed to pay support for a period in excess of four (4) months pursuant to T.C.A. § 36–1–113(g)(9)(A)(ii)." [22] However, the grounds for termination listed in section

---

**22.** This ground for termination states that it applies if "[t]he person has failed, without good cause or excuse, to make reasonable and consistent payments for the support of the child in accordance with the child support guidelines promulgated by the department pursuant to § 36–5–101." Tenn.Code Ann. § 36–1–113(g)(9)(A)(ii).

36–1–113(g)(9) only apply to persons who are "not the legal parent or guardian" of the child at the time of filing of the termination petition. *See* Tenn.Code Ann. § 36–1–113(g)(9)(A). The definition of "[l]egal parent" includes "[t]he biological mother of a child." Tenn.Code Ann. § 36–1102(28)(A). Accordingly, "[t]he grounds for termination in Tenn.Code Ann. § 36–1113(g)(9) cannot be used to terminate the rights of a person who is a child's biological parent, legal parent, or putative biological father at the time the termination petition is filed." *In re Bernard T.,* 319 S.W.3d 586, 599 (Tenn.2010) (citing *In re D.A.H.,* 142 S.W.3d 267, 272–73 (Tenn. 2004)). "The grounds for terminating the rights of a person who *is* a child's biological parent, legal parent, or putative biological father are found in Tenn.Code Ann. § 36–1–113(g)(1)–(8), (10)." *Id.* (emphasis added).

▮ In this case, the Mitchells could not use the grounds listed in subsection (g)(9) to terminate Mother's parental rights. The alleged ground of failure to support pursuant to section 36–1–113(g)(9)(A)(ii) was inapplicable. However, during trial, both sides appeared to proceed under the assumption that the termination petition alleged abandonment by willful failure to support pursuant to section 36–1–113(g)(1), which does apply to biological parents. Throughout the trial, the judge heard testimony about Mother's circumstances during the four-month period prior to the filing of the termination petition, which, as explained below, is the focus of the inquiry for willful failure to support pursuant to section 36–1–113(g)(1). The Mitchells' attorney specifically cited "abandonment" and its definition in section 36–1102 in his closing argument, and Mother's attorney discussed the applicability of this ground as well. Moreover, on appeal, Mother's brief analyzes the ground of abandonment under subsection (g)(1), stating, "[t]he grounds for termination alleged and relied upon in the instant case, are as follows: (1) Abandonment by the parent or guardian, as defined in § 36–1102...."

▮ "A ground for termination not included in the petition can be properly found if the ground was tried by implied consent." *In re Johnny K.F.,* No. E2012–02700–COA–R3–PT, 2013 WL 4679269, at *8 (Tenn.Ct.App. Aug. 27, 2013) (citing *In re: Anthony R.,* No. M2012–01412–COA–R3–PT, 2013 WL 500829, at *4 n. 5 (Tenn. Ct.App. Feb. 8, 2013)); *see, e.g., In re Adoption of Angela E.,* 402 S.W.3d 636, 640 n.3 (Tenn.2013) (finding that the ground of abandonment by willful failure to support was tried by consent).

> The strict application of procedural requirements in cases involving the termination of parental rights requires that before there can be a finding that a ground for termination not alleged in the petition was tried by implied consent, the record must be clear that such ground indeed was tried by implied consent.

*In re Johnny K.F.,* 2013 WL 4679269, at *8. The record before us demonstrates that Mother consented to the ground of abandonment by willful failure to support being tried by the trial court. Therefore, we will proceed to consider the merits of this issue.

▮ The first ground for termination listed in the termination statute, and the one most frequently relied on, is abandonment. *In re Audrey S.,* 182 S.W.3d 838, 862 (Tenn.Ct.App.2005). For purposes of terminating parental rights, there are five alternative definitions of abandonment listed in Tennessee Code Annotated section 36–1–102(1)(A)(i)–(v). Pursuant to the first definition, which is the one relevant to this case, "abandonment" means that:

For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child[.]

Tenn.Code Ann. § 36–1–102(1)(A)(i). Abandonment can be established by showing that a parent either willfully failed to visit or willfully failed to support the child during the relevant time period. *In re Christopher M.*, No. W2010–01410–COA–R3–PT, 2010 WL 4273822, at *10 (Tenn.Ct. App. Nov. 1, 2010) (citing *In re Adoption of McCrone*, No. W2001–02795–COA–R3–CV, 2003 WL 21729434, at *10 (Tenn.Ct. App. July 21, 2003)).

Willful failure to support or to make reasonable payments toward support means "the willful failure to provide more than token payments toward the support of the child." Tenn.Code Ann. § 36–1–102(1)(D). Token support payments are not sufficient to preclude a finding of willful failure to support. Token support is support that "under the circumstances of the individual case, is insignificant given the parent's means." Tenn.Code Ann. § 36–1102(1)(B). In termination proceedings, "the term 'token support' is a term of art." *In re Z.J.S.*, No. M2002–02235–COA–R3–JV, 2003 WL 21266854, at *11 (Tenn.Ct.App. Jun. 3, 2003). A finding that support was "insignificant" in light of the parent's "means" must be based on evidence regarding both the parent's actual financial support of his or her child and the parent's "means." *Id.* "In the context of token support, the word 'means' connotes both income and available resources for the payment of debt." *In re Adoption of Angela E.*, 402 S.W.3d at 641 (citing *In re Z.J.S.*, 2003 WL 21266854, at *11 n.24; *Black's Law Dictionary* 1070 (9th ed. 2009)). "The definition of token support itself requires consideration of the circumstances of the individual case." *In re K.C.*, 2005 WL 2453877, at *9 (citing Tenn.Code Ann. § 36–1–102(1)(B)).

The willful failure to visit, support, or make reasonable payments toward the support of the child must have occurred in the four months immediately preceding the filing of the termination petition currently before the court. *In re D.L.B.*, 118 S.W.3d 360, 366 (Tenn. 2003). Here, it is undisputed that Mother did not submit any monetary child support payments to the Mitchells during the four month period. When the petition was filed, Mother had not made a monetary child support payment in four months and three days. The central issue on appeal regarding Mother's failure to pay child support is whether her actions were willful. "The requirement that the failure to visit or support be 'willful' is both a statutory and a constitutional requirement." *In re Adoption of Kleshinski*, No. M2004–00986–COA–R3–CV, 2005 WL 1046796, at *17 (Tenn.Ct.App. May 4, 2005). Therefore, the element of willfulness is essential and central to the determination of abandonment. *In re M.L.D.*, 182 S.W.3d 890, 896 (Tenn.Ct.App.2005); *In re C.M.C.*, No. E2005–00328–COA–R3–PT, 2005 WL 1827855, at *6 (Tenn.Ct.App. Aug. 3, 2005). Willfulness in the context of termination proceedings does not require the same standard of culpability as is required by the penal code, nor does it require that the parent acted with malice or ill will. *In re Audrey S.*, 182 S.W.3d at 863; *see also In re S.M.*, 149 S.W.3d 632, 642 (Tenn.Ct.App. 2004). Rather, a parent's conduct must have been willful in the sense that it con-

sisted of intentional or voluntary acts, or failures to act, rather than accidental or inadvertent acts. *In re Audrey S.*, 182 S.W.3d at 863. "A parent cannot be said to have abandoned a child when his failure to visit or support is due to circumstances outside his control." *In re Adoption of Angela E.*, 402 S.W.3d at 640 (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810 (holding that the evidence did not support a finding that the parents "intentionally abandoned" their child)).

Willfulness of a parent's conduct depends on the parent's intent, and intent is seldom capable of direct proof. *In re Audrey S.*, 182 S.W.3d at 864 (citing *In re Adoption of S.M.F.*, No. M2004–00876–COA–R9–PT, 2004 WL 2804892, at *8 (Tenn.Ct.App. Dec. 6, 2004)). Triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations and must infer intent from circumstantial evidence, including the parent's actions or conduct. *Id.* Because testimony may be critical to the determination of whether a parent's conduct was willful, trial courts are best situated to make a determination of willfulness. *In re D.L.B.*, 118 S.W.3d at 367. The question of intent or willfulness depends on the totality of the circumstances, and the facts must be applied to the standard definition of willfulness. *V.D. v. N.M.B.*, No. M2003–00186–COA–R3–CV, 2004 WL 1732323, at *6 (Tenn.Ct.App. July 26, 2004). "Whether a parent failed to visit or support a child is a question of fact. Whether a parent's failure to visit or support constitutes willful abandonment, however, is a question of law." *In re Adoption of Angela E.*, 402 S.W.3d at 640 (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810). This Court reviews questions of law *de novo* with no presumption of correctness. *Id.*

In the trial court's letter ruling, it made specific findings when analyzing the ground of abandonment by willful failure to support. At the outset, the court noted "the litany of proceedings during which Mother requested modification of her visitation schedule due to her work requirements." "Specifically," the court said, efforts were made to accommodate Mother's work schedule during hearings on September 30, 2011, and June 15, 2012. On appeal, we have no transcript of the aforementioned hearings that would enable us to review Mother's statements about her work schedule. The written order from the September hearing fails to mention any testimony and states that the court ruled "[u]pon argument of counsel and a review of the file as a whole." In any event, however, Mother's representations about her day-to-day work schedule in September 2011 and June 2012 would not shed any light on whether she had the ability to support Alysia during the relevant time frame between April 10 and August 9, 2011. The letter ruling further stated,

In the proceeding at bar, the Mother again came before the Court, with variations of places of employment, work schedules, and compensation that are inconsistent with that of her own witnesses, let alone her prior sworn testimony before this Honorable Court. However, regardless of Mother's choice as to her version of her employment history among the variety of those presented before the Court, Mother cannot deny that she has been employed; received compensation for her employment; and chosen to pay her debts, except for any funds for which she is morally and legally obligated to provide for the benefit of the minor child.

. . . .

Therefore, the Court finds that the Mother['s] . . . failure to provide for the Child's support during the statutory

time period as set forth in T.C.A. §§ 36–1–113(g)(1) and 36–1–102(1)(A)(i) is, in fact, "willful". As such, the Court finds by clear and convincing evidence that the Mother['s] ... parental rights shall be terminated as to the Child for [her] abandonment by failure to support.

As we explained above, Mother testified that she worked for the temporary staffing agency during the entire four-month period at issue, which spanned from April 10 until August 9, 2011. Mother's last child support payment prior to the four month period was on April 7, 2011, in the amount of $200. Mother testified that she accepted every job she was offered through the staffing agency. Mother testified that jobs were "very, very limited" where she lived and that it was even more difficult to find a job during the summer months because of college students returning home. She testified that she applied for jobs "all over the place," including two restaurants, other temporary employment services, grocery stores, Wal-mart, and different clothing stores. Mother testified that she went to a career center and sought advice, and she completed online applications for work in surrounding counties. Mother claimed she did "everything [she] could to find work" and that she "did the best that [she] could" by working at the staffing agency.

Mother testified that she worked, through the staffing agency, at a lighting factory from March 27 until May 10, making $9.00 to $9.25 an hour for 30 to 38 hours per week. This equates to about six weeks of employment. Although this period of employment began prior to the four-month period, the staffing agency "held back" Mother's first paycheck, and then paid her every two weeks, so Mother would have received her first paycheck from working at the lighting factory during the four-month period. By our calculation, Mother earned somewhere between $270 and $351 per week, before taxes were withheld, during that time ($9 × 30 hours; $9.25 × 38 hours). Mother testified that her paycheck from the lighting company, for a two-week period, was about $450. She testified that she did not use any of the funds from the three paychecks she received while working at the lighting factory to pay child support because she was "so far behind" on her bills. Since Alysia left in June 2010, Mother had worked at several jobs, but none lasted longer than a matter of weeks.[23] She worked "an hour or two a week" at a church, then worked part-time at a catering business helping with four to five parties during the holidays, then about eight weeks at an Applebee's until the car she had purchased with a friend "broke down," and then a couple of weeks at another restaurant.

Mother testified that her monthly bills during the four-month period included $320 for rent, $120 for insurance, $60 for the water bill, $120 to $140 for the electric

---

23. We recognize that the statutory definition of "abandonment" requires us to focus on the "period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights[.]" Tenn.Code Ann. § 36–1–102(1)(A)(i). However, in determining whether a parent's conduct was "willful," it may become necessary in a given case to evaluate events occurring prior to the start of the four month period. Events occurring prior to the four month period may bear on the "willfulness" of the parent's conduct during the four month period. See *In re Alex B.T.*, No. W2011–00511–COA–R3–PT, 2011 WL 5549757, at *6 (Tenn.Ct.App. Nov. 15, 2011) ("courts often consider events that occurred prior to the relevant period to determine if there was interference with the biological parent's attempts to visit or support the child"); see also *In re Keri C.*, 384 S.W.3d 731, 748– (Tenn.Ct.App.2010) (explaining that the parent's conduct prior to the four month period is "relevant background and context for the necessarily fact-intensive evaluation" of the parent's conduct during the four month period).

bill, $300 for groceries and household items, and an unspecified amount for her telephone bill. Mother was also responsible for paying the cost of supervised visitation with Alysia, which was $15 an hour. In addition, she was attempting to pay her attorney's fees in the ongoing dependency and neglect trial, which was held in circuit court over the course of four days between April and June 2011, all during the four-month period. Mother did not have a vehicle at the time, so she was paying someone to take her to and from visitation with Alysia in Murfreesboro, to and from the court hearings in Murfreesboro, and to her place of employment when she did not walk. Mother testified that she had about $300 in monthly travel expenses for attending court in Murfreesboro, which was apparently about two hours from Mother's home. Mother testified that she was trying to save some money to buy a car so that she would have reliable transportation to her visits, her court dates, and her job, because the person transporting her caused her to be late to a visit in March 2011. In May 2011, Mother purchased a car and assumed a $200 per month car payment. She also paid for car insurance.

On May 10, 2011 Mother said the lighting factory "laid us off" because the temporary workers were no longer needed. Mother testified that she did not receive a paycheck during the entire month of June. She testified that her next job was at a factory spraying bathtubs with fiberglass. It lasted less than one week, from June 27 until July 1, and it was also through the staffing agency. She worked approximately thirty hours and earned $7.25 per hour. By our calculation, this would total $217 before taxes were withheld. Mother testified that she used her paycheck from this employment to pay bills that were past due, and she also used some of the money to buy school clothes for Alysia. She testified that she sent Alysia three to four outfits, shoes, socks, underwear, and vitamins. At trial, Mrs. Mitchell was asked whether she received clothing for Alysia from Mother during the four-month period, and she said she could not recall. Aside from this job ending July 1, Mother did not have another job during the month of July. Nevertheless, she completed the parenting classes at the state university on or about July 30, 2011, at her own expense. On August 2, 2011, Mother took the drug and alcohol assessment at a private facility, at her own expense.

Mother's next job through the staffing agency began on August 8, 2011 just two days before the termination petition was filed, and it lasted until September 5. She earned $7.25 an hour at this job. Mother initially testified that this job was at a clothing factory, but on a later date during the trial, when she was asked to describe her employment history again, she testified that she worked on these dates at a factory called "Rio" and said that she had been unable to remember this factory during her previous testimony. Either way, Mother would not have received a paycheck from this employment prior to the end of the four-month period on August 9 because her first paycheck from each job was "held back" by her employer. Mother made a $700 child support payment on September 16, 2011.

In sum, Mother provided detailed and compelling testimony that she did the best that she could to support Alysia, while also attempting to comply with the DCS plan and court orders, and she testified that she did not "intentionally" fail to make monetary child support payments. When the trial court summarized each witness's testimony in its letter ruling, the court acknowledged Mother's testimony that her employment during the four-month period was temporary and sporadic and that she did not make child support payments be-

cause she utilized her income to pay bills and because the Mitchells had previously told her not to pay them child support. When summarizing the testimony of Mother's husband, the trial court said Husband testified that Mother had "more consistent periods of employment" and "worked at the same place as him for a rather lengthy period[.]" Notably, however, the trial court *did not make a finding* that Mother was employed at Rio at any point, especially during the four month period at issue. We find the evidence about Mother's employment at Rio neither clear nor convincing.

As we explained above, at the trial in May 2013, Husband was asked if Wife had worked at Rio during his four years of employment there, and he said that she did. He estimated that she worked there "[m]aybe four months, five months.... Could have been longer." He was asked if this employment occurred in and around the middle of 2011 but said he could not remember.[24] When asked about Mother's periods of unemployment, he said he did not "keep up with time and stuff like that." Mother's mother was asked whether she remembered Mother's employment situation during the spring and summer of 2011, and she said that Mother had a hard time finding a job and meeting her expenses during that period. She could not remember when or how long Mother worked at Rio. When Mother's father was asked at trial about Mother's employment situation in the spring and summer of 2011, he said Mother "couldn't find nothing nowhere" because "[t]he economy and everything was doing so bad in our area that temporary services, nobody had nothing available." He remembered that Mother had worked at Rio through the temporary employment service at some point in the past, and he estimated that she worked there "[a]bout two or three months maybe." When asked if that employment would have been "about the spring/summer of 2011," he said, "Yes, it would be."

The testimony of Mother's husband and her parents does cast doubt on whether Mother worked at Rio for one month, as she claimed, two or three months as her father testified, or four to five months as her husband testified. However, even assuming that Mother worked at Rio for longer than she claimed, there is no clear evidence that this period of employment at Rio corresponded with the four-month period preceding the filing of the termination petition, from April 10 to August 9, 2011. Mother testified that she began working at Rio on August 8, two days before the termination petition was filed. Therefore, it is reasonable to assume that the duration of Mother's employment at Rio occurred after the four-month period at issue and that she was compensated for this employment after the four-month period.[25] Even though Mother's father testified that Mother worked at Rio "about two or three months maybe" sometime "about the spring/summer of 2011," this testimony is far from certain. Piecing all of this testimony together does not prove that Mother worked at Rio during the four-month period, received her paycheck from that employment during the four-month period, and therefore had the capacity to pay monetary child support during the four-month period but willfully failed to do so.

24. Mother and her current husband married in December 2012, but they had been in a relationship for nearly three years.

25. According to the Mitchells' brief on appeal, "there is no dispute that [Mother] worked at [the lighting factory] from March 2011 through May 10, 2011, and then June 27 through July 1, 2011 at [the factory where she sprayed bathtubs]."

When summarizing the testimony of the witnesses, the trial court also stated that "contrary to Mother's assertions, [her husband] testified that Mother has worked consistently while he has known her with the exception of a 6–7 month period." We find no such testimony by the husband. He actually testified as follows:

Q. During the time that you have known [Mother], does she appear to be a hard-working individual?

A. Yes, sir.

Q. Has she ever gone any long periods of time without a job?

A. Yes, sir.

Q. When?

A. There for a minute she didn't have a job for about six to eight months.

Q. Do you know about when that was?

A. No, sir. I don't keep up with time and stuff like that. I'm just a working guy, you know?

Husband said that over the past three years, Mother had "looked for jobs and looked for jobs." From our reading of Husband's testimony, he said that Mother had experienced periods of unemployment and that one such period lasted six to eight months. He did not say that Mother "worked consistently" while he had known her with the exception of that one period.

Although the trial court noted the inconsistencies in the witnesses' testimony about Mother's employment history, the court did not make any express findings about Mother's employment. Instead, the court found that

regardless of Mother's choice as to her version of her employment history among the variety of those presented before the Court, Mother cannot deny that she has been employed; received compensation for her employment; and chosen to pay her debts, except for any funds for which she is morally and legally obligated to provide for the benefit of the minor child.[26]

Simply finding that Mother worked and was compensated at some point during the four-month period does not, by itself, mean that she had the ability to pay child support. The trial court did not make any findings regarding Mother's income, nor did it mention Mother's expenses.

The trial court found that Mother "failed to pay a cent during the statutory time frame that the Court must consider" and failed to pay even "token support for the benefit of the child during the four months preceding the filing of the Petition." It is worth noting that in January 2011, Mother was told to stop bringing gifts for Alysia to the supervised visits. Nevertheless, the records from the Exchange Club indicate that on April 14, 2011, at the beginning of the four-month period, Mother "brought several items" to her supervised visit with Alysia, including a "My Littlest Pet Shoppe container with numerous small toys inside, an Ice Age DVD, a small puzzle, a box of fruit snacks unopened, and a camera." The monitor again advised Mother "that per the court order, she is not to bring any gifts to the visits," and "per agency policy, she is not to bring food into the visits." The items were removed from the area and returned to Mother at her departure. The trial court failed to

---

**26.** The trial court's letter ruling also discussed testimony from a witness named "Randy Cothan" and said he "appeared before the Court and presented testimony regarding the period of time he resided with the Mother and Father in 2010." Based on this testimony, the court concluded that Mother and Alysia's father "squandered resources that could have been utilized to support the child." The record on appeal contains no testimony by an individual named "Randy Cothan" at the termination trial. Therefore, we will not consider the trial court's discussion of this testimony.

mention these items or the school clothing that Mother sent to Alysia during the four-month period, which included several new outfits, shoes, socks, underwear, and vitamins.[27]

▇▇ We also recognize that the Mitchells told Mother not to pay them monetary child support. Mrs. Mitchell testified, "We actually asked her not to pay, so that she would be able to do the things that she was saying she needed to do[.]" Mr. Mitchell also testified, "we wanted her to keep that, apply it to her visits, use it to get her life back on track." During the pivotal four-month period, Mother did just that, directing her limited financial resources toward regaining custody of Alysia. She paid for the cost of supervised visits. She paid someone to transport her to and from visits and to and from court hearings. She paid for a drug and alcohol assessment recommended by DCS. She paid for parenting classes. She attempted to obtain reliable transportation and establish a stable home.[28] She was in the midst of a four-day trial on the dependency and neglect petition and paying attorney's fees incurred in that litigation. Mother used all of these funds in an attempt to comply with the responsibilities established by DCS and by the courts so that she could be reunited with Alysia. Mother was aware that the Mitchells were financially stable and that Alysia's needs were being met. The Mitchells had previously informed her that they could provide for Alysia without monetary support from Mother. We also note that Mother had never been advised of the criteria and procedures for terminating her parental rights or the definition of abandonment.

27. Early in the proceedings, Mother sent packages for Alysia containing clothing that was not new, and the guardian ad litem had a discussion with Mother about sending only appropriate items. After that discussion, Mother sent only new clothing and new shoes to Alysia. At trial, Mother testified that she had "a lot" of clothing for Alysia that she "wasn't able to give to her at her visits or anything else." Mother also testified that every time she asked the Mitchells about sending supplies for Alysia, they told her that "she was fine."

When assessing the willfulness of a parent's failure to pay child support, we have said that the failure of a child's foster parents to ask for monetary support, coupled with their "rebuff" of the parent's inquiry about specific items that were needed, and the parent's provision of in-kind support during visits were "part of the constellation of facts that must be considered to assess willfulness." *In re Kaleb N.F.*, No. M2012–00881–COA–R3–PT, 2013 WL 1087561, at *23 (Tenn.Ct.App. Mar. 12, 2013).

28. We note that in its letter ruling, the trial court found that "Mother has continued to pay rent on a vacant trailer throughout these proceedings, including the period when she failed to provide support for the child."

Mother testified at trial that she was renting a trailer before she moved to the trailer owned by her current husband, and after she moved, she kept her furniture and belongings at the former residence until her lease expired because she could not afford to "buy [her] way out of the lease," and it was cheaper to continue paying the rent. Accordingly, we do not find that Mother wasted funds on a vacant trailer that she could have used to pay child support.

We have also considered the fact that Mother owned a vacant house trailer throughout these proceedings, where she planned to live when she could find an affordable lot. Mother paid $600 in cash for the trailer when Alysia still lived with her. Under the circumstances of this case, we find that Mother's ownership of this asset does not provide clear and convincing evidence that she had the capacity to pay child support and willfully failed to do so. *Compare In re Adoption of Angela E.*, 402 S.W.3d at 639 (finding no clear and convincing evidence of willful failure to support despite the fact that the father was a physician who was in the process of constructing a new home currently worth $300,000 to $400,000, in which he had invested $600,000, and which was not subject to a lien in any amount).

We find the facts of this case quite similar and comparable to the facts in *In re Adoption of A.M.H.*, 215 S.W.3d 793 (Tenn.2007). In that case, a Chinese couple placed their four-week-old child in temporary foster care while they attempted to regain financial stability. *Id.* at 797. A year later, they filed a petition seeking to regain custody of the child from the foster parents. *Id.* at 800. During these proceedings, the parents went four months without visiting the child due to the animosity between the parties and prior police involvement. *Id.* at 801–802. The foster parents filed a petition to terminate the parental rights of the parents on the ground of abandonment by willful failure to visit. *Id.* at 802. The supreme court held that the trial court erred in finding a willful failure to visit "because the undisputed evidence show[ed] that there was animosity between the parties and that the parents were actively pursuing custody of [the child] through legal proceedings during the four-month period immediately preceding the filing of the petition for termination of parental rights[.]" *Id.* at 796. The court held that the evidence before it did not support a finding that the parents "intentionally abandoned" the child. *Id.* at 810.

Although the case before us involves a parent's failure to support rather than failure to visit during litigation, we believe the holding of *A.M.H.* on the issue of willful or intentional abandonment is instructive. Here, Mother was actively pursuing litigation to regain custody of Alysia throughout the four-month period, and she was spending a substantial portion of her limited financial resources to do the things that DCS and the juvenile court instructed her to do. The evidence does not support a finding that Mother willfully or "intentionally abandoned" Alysia.

"As a question of law, the trial court's ruling that the facts of this case sufficiently support the termination ground of willful abandonment [is] reviewed de novo with no presumption of correctness." *In re Adoption of A.M.H.*, 215 S.W.3d at 810. "To prove the ground of abandonment, a petitioner must establish by clear and convincing evidence that a parent who failed to visit or support had the capacity to do so, made no attempt to do so, and had no justifiable excuse for not doing so." *In re Adoption of Angela E.*, 402 S.W.3d at 640. "Clear and convincing evidence" has been defined as "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Id.* (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn.2002)). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Audrey S.*, 182 S.W.3d at 861. The evidence in this case falls short of meeting that standard. The evidence presented by the Mitchells simply does not produce a firm belief or conviction, in our minds, that Mother, during the four month period, had the capacity to support Alysia, made no attempt to do so, and had no justifiable excuse for not doing so. We hold that the evidence in this case does not support a finding that Mother intentionally abandoned Alysia, and we therefore reverse the trial court's finding that this ground for termination was proven by clear and convincing evidence.

## 2. Substantial Noncompliance with a Permanency Plan

The next ground for termination alleged in the Mitchells' petition is found in Tennessee Code Annotated section 36–1–113(g)(2) and applies when "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pur-

suant to the provisions of title 37, chapter 2, part 4." Tennessee Code Annotated section 37–2–402(9) defines a "permanency plan" as "a written plan for a child placed in foster care with the department of children's services or in the care of an agency as defined in subdivision (3) and as provided in § 37–2–403." Here, Alysia was not placed in foster care with DCS or in the care of an agency. Mother signed a "noncustodial" plan on the same date that she signed the power of attorney, and she signed a "family permanency plan" just days before DCS closed it case. However, these plans do not meet the statutory definition of a permanency plan. Because this ground for termination only applies when a parent fails to comply with "the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4," Tenn.Code Ann. § 36–1113(g)(2), we find it inapplicable to this case. *Cf. In re Kaleb N.F.,* 2013 WL 1087561, at *21 (refusing to apply the ground of substantial noncompliance with a permanency plan when the child was "safety-placed" with a neighbor, and the

parent signed a "Family Services Plan" with DCS that was not the type of "permanency plan" that could serve as the basis for terminating parental rights).

■ In any event, however, we find that Mother substantially complied with the responsibilities set forth in the plans, with little to no assistance from DCS. She was required to become drug-free, take an alcohol and drug assessment and drug screens, maintain contact with DCS, obtain legal income, maintain stable housing, and call and visit Alysia. We agree with Ms. Reed's opinion that, for the most part, Mother completed what DCS asked of her. Mother continued her attempts to comply with the plan, at her own expense, even after DCS closed its case. For all these reasons, we find no clear and convincing evidence of substantial noncompliance with a permanency plan.[29]

### 3. Persistent Conditions

■ The Mitchells' petition to terminate Mother's parental rights also alleged

**29.** The trial court's letter ruling mentioned that this ground was alleged in the petition. However, it did not analyze the applicability of this ground for termination. After discussing the grounds of abandonment and persistent conditions, the trial court simply stated that "any remaining claims unless specifically addressed are dismissed." Tennessee Code Annotated section 36–1–113(k) requires trial courts to enter an order making specific findings of fact and conclusions of law no later than 30 days after a termination hearing. Our supreme court has stated that " 'given the importance of establishing the permanent placement of a child who is the subject of a termination of parental rights proceeding, the trial court should include in its final order findings of fact and conclusions of law with regard to each ground presented.' " *In re Angela E.,* 303 S.W.3d 240, 251 (Tenn.2010) (quoting *In re D.L.B.,* 118 S.W.3d 360, 367 (Tenn.2003)). Accordingly, the court of appeals has repeatedly directed trial courts to issue written orders with the requisite findings and conclusions on all grounds whether they have been requested to do so or not. *Id.* We have routinely remanded contested termination cases to the trial court for failure to make findings of fact and/or conclusions of law. *See, e.g., In re Adoption of Muir,* No. M2002–02963–COA–R3–CV, 2003 WL 22794524, at *3 (Tenn.Ct.App. Nov. 25, 2003) (remanding because the trial court omitted factual findings underlying its conclusion that grounds for termination did not exist); *but see White v. Moody,* 171 S.W.3d 187, 192 (Tenn. Ct.App.2004) (declining to vacate a trial court's judgment for inadequate best-interest findings because the case had already been remanded twice, thus prolonging the litigation by three years). In this case, the trial court made no findings regarding substantial noncompliance. However, we have addressed the ground in this opinion because this case has been delayed far too long already, and we find the ground clearly inapplicable regardless of the lack of particularized findings by the trial court.

the ground commonly referred to as "persistent conditions" found in Tennessee Code Annotated section 36–1–113(g)(3). This ground for termination exists when:

The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

Tenn.Code Ann. § 36–1–113(g)(3). In order to terminate parental rights, there must be clear and convincing evidence of each of these elements. *In re Valentine*, 79 S.W.3d at 550.

Considering the unique circumstances of the case before us, we find the ground of persistent conditions inapplicable. The first prerequisite for the applicability of this ground is that "[t]he child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months." Tenn.Code Ann. § 36–1–113(g)(3). Because the statute refers to the original "conditions which led to the child's removal" and to "other conditions" which in all reasonable probability would cause a child to be subjected to *"further* abuse and neglect," Tenn.Code Ann. § 36–1–113(g)(3) (emphasis added), we have held that this ground for termination applies "only where the prior court order of removal was based on a judicial finding of abuse or neglect." [30] *In re Audrey S.*, 182 S.W.3d at 872. Here, the only judicial finding of dependency and neglect was by the juvenile court, and that finding was set aside by the circuit court. This Court affirmed the circuit court's decision to dismiss the petitions for dependency and neglect. The Mitchells do not cite any authority for the notion that an erroneous judicial finding of dependency and neglect, which is later reversed, can serve as the basis for terminating parental rights on the ground of persistent conditions. In fact, we would be unable to find the *persistence* of "conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to *further* abuse or neglect," Tenn.Code Ann. § 36–1–113(g)(3)(emphasis added), when we have previously held that Alysia was not subject to conditions that rendered her dependent or neglected in the first place. Because there was never a valid finding of dependency and neglect in this case, we conclude

---

**30.** The ground of persistent conditions may apply even where the child was not removed from the biological parent by DCS. *In re Adoption of AMH*, No. W2004–01225–COA–R3–PT, 2005 WL 3132353, at *80 (Tenn.Ct.App. Nov. 23, 2005) *rev'd on other grounds* 215 S.W.3d 793 (Tenn.2007); *In re K.C.*, No. M2005–00633–COA–R3–PT, 2005 WL 2453877, at *12 (Tenn.Ct.App. Oct. 4, 2005). However, as the Court held in *Audrey S.*, the prior court order removing the child must have been based on a judicial finding of dependency, neglect, or abuse. Therefore, "while it is possible that the persistent conditions ground for termination may apply in cases where the child is not removed by the state, the order directing the change in custody must be prompted by a finding of dependency, neglect, or abuse." *Id.* at *81.

that the Mitchells cannot rely on the ground of persistent conditions.

### 4. Risk of Substantial Harm

The final ground for termination asserted by the Mitchells was that returning the child to Mother would pose a risk of substantial harm, pursuant to Tennessee Code Annotated section 36–1–113(g)(9)(A)(v). The trial court's final order did not specifically analyze this ground for termination, but the Mitchells ask this Court to review the facts and determine whether this ground was proven. As discussed above, the grounds listed in subsection (g)(9) cannot be used as a basis for terminating the parental rights of a biological parent, such as Mother. Therefore, we find this ground inapplicable despite the lack of findings by the trial court.

Because we conclude that there are no grounds for terminating Mother's parental rights, we do not reach the best interest of the child analysis.

### B. Proceedings on Remand

"When [an appellate court] reverses a lower court's termination of parental rights in a contest between parents and non-parents for custody, we usually remand the case to the trial court for the preparation and implementation of a plan to return custody of the child to the parent." *In re Adoption of A.M.H.*, 215 S.W.3d at 811. The authorization of temporary guardianship Mother executed in favor of the Mitchells expired by its terms on January 1, 2011. Because Mother's voluntary relinquishment of custody was entered as a temporary measure with the full intent that custody would be returned to her, she is entitled to superior rights to custody when compared to the Mitchells as non-parents. *See id.* at 811–12. With regard to the proceedings that should take place on remand, we again find guidance in

the supreme court's decision in *In re Adoption of A.M.H.*, 215 S.W.3d 793 (Tenn.2007). There, the daughter of the Chinese couple had been in the custody of the foster parents since she was an infant. Legal proceedings began when she was one year old, and by the time of the proceedings before the supreme court, the child had been in the custody of the foster parents for more than seven years. Six of those years elapsed after the parents' first unsuccessful legal filing to regain custody. *Id.* at 796–97. During the proceedings before the trial court, a clinical psychologist was appointed to evaluate the child who, at that time, had not seen her parents in over a year. He reported that the child considered the foster parents her "psychological parents" and concluded that a child who experiences loss in early childhood is at a greater risk of developing serious psychological disorders. *Id.* at 803–804. After the supreme court reversed the trial court's decision to terminate the parents' parental rights, it addressed who was entitled to custody of the child on remand. The court explained:

> Under the superior rights doctrine, "a natural parent may only be deprived of custody of a child upon a showing of substantial harm to the child." *In re Askew*, 993 S.W.2d 1, 4 (Tenn.1999). Therefore, the determination of a custodial dispute between a parent and a non-parent rests on a determination of whether there is substantial harm threatening a child's welfare if the child returns to the parents. Only then may a court find a sufficiently compelling justification for the infringement of the parents' fundamental right to raise a child as they see fit. *See id.* at 3.

Here, the only evidence of substantial harm arises from the delay caused by the protracted litigation and the failure of the court system to protect the par-

ent-child relationship throughout the proceedings. Evidence that A.M.H. will be harmed from a change in custody because she has lived and bonded with the Bakers cannot constitute the substantial harm required to prevent the parents from regaining custody.[31] We have previously rejected the contention that when a child has been in the custody of a non-parent for a significant period of time, a lesser standard may be applied in determining whether parental rights may be terminated. *In re Swanson*, 2 S.W.3d [180,] 188 n.13 [ (Tenn. 1999) ]. "Such a standard would increase the likelihood for delaying cases in order that the child remain" in the custody of the non-parent. *Id.* The same reasoning applies in this situation.

Additionally, we note that the testimony concerning the general conditions in China is not relevant to a finding of substantial harm. Financial advantage and affluent surroundings simply may not be a consideration in determining a custody dispute between a parent and a non-parent. *See Hawk* [*v. Hawk* ], 855 S.W.2d [573,] 582 [ (Tenn. 1993) ] ("[M]ere improvement in quality of life is not a compelling state interest and is insufficient to justify invasion of Constitutional rights.") (internal quotation marks and citation omitted). The evidence at trial showed that the parents have overcome many obstacles to achieve financial stability and are ably taking care of their other two children. Given the lack of evidence of a threat of substantial harm to A.M.H. if she is returned to her parents, we conclude that physical custody of A.M.H. must be returned to the parents.

*Id.* at 812–13. Having found that the trial court erred in terminating the parents' parental rights, the supreme court dismissed the termination petition, reinstated the parents' parental rights, vacated the juvenile court and chancery court orders concerning visitation, and designated the current custody and guardianship orders as temporary in nature. The court directed the juvenile court on remand "to consider, prepare, and implement a plan to resolve the pending custody matter with a view toward reunification of A.M.H. with her natural parents [ ] in a manner that minimizes trauma to the child." *Id.*

■ In Alysia's case, the final orders in the dependency and neglect proceedings held that the juvenile court was not authorized to grant disposition of custody to the Mitchells and that there was no basis for a finding of dependency and neglect. Accordingly, the circuit court held that reunification with Mother was appropriate, and, finding the case analogous to *A.M.H.*, the circuit court likewise instructed the juvenile court to "consider, prepare and implement a plan to resolve the pending custody matter with a view toward reunification of the child … with her Mother, Kathryn S[.], in a manner that minimizes trauma to said child." On remand, however, the juvenile court appeared extremely hesitant to reunify Mother and Alysia. This record provides no basis for such hesitation, other than the general concern that exists in all reunifications following a lengthy separation, which is the concern that a change in custody may be difficult for the child. Using the language of the supreme court in *A.M.H.*, we emphasize to the juvenile court that "[e]vidence that [Alysia] will be harmed from a change in custody because she has lived and bonded

---

**31.** The supreme court noted that such evidence may be relevant to the manner of implementing the transition in custody from the

non-parents to the parents and to the possible allowance of visitation with the non-parents.

with the [Mitchells]" during the pendency of the litigation does not "constitute the substantial harm required to prevent [Mother] from regaining custody." *Id.* at 812. In addition, this young child cannot be the one to decide whether she will visit or be reunited with Mother. *See, e.g., Carter v. Carter,* No. M2013–00193–COA–R3–CV, 2013 WL 5568360, at *3 (Tenn.Ct. App. Oct. 7, 2013) ("This Court is aware of no authority for permitting a child to have the discretion to decide when and whether to spend time with a parent.").

We are troubled by the facts of this case and the proceedings to this point. As at least one of our predecessors said, "[t]he termination of parental rights ... is just as final as a death sentence." *Tennessee Dep't of Human Services v. Riley,* 689 S.W.2d 164, 172 (Tenn.Ct.App.1984) (Nearn, J., dissenting). In this case, DCS found no reason to remove Alysia from Mother. Yet the juvenile court required Mother to have only supervised visitation with her child, when the child was living in a home that had never been inspected with non-family members who, by all indications, were never even subjected to background checks.

On appeal, Mother expressed concern that even if this Court reverses the termination of her parental rights and remands the case, once again, for reunification, "the child will not be reunified with mother under the trial court's authority." Thereafter, when the Mitchells filed their brief on appeal in their postures as appellees, they attached to their brief a "Final Order of Adoption" indicating that they adopted Alysia by order of the chancery court for Rutherford County on June 9, 2014, while this appeal was pending. The chancery court's order of adoption recognizes that Mother's parental rights were terminated and states that "the Juvenile Court exhorted Plaintiffs to proceed quickly with this adoption." The order states that Mother was not entitled to notice of the adoption proceeding because her parental rights were terminated. The order waived the statutory six-month waiting period and immediately granted the adoption and changed Alysia's first and last name.[32] According to Mother, she was unaware of the adoption proceeding until she received the appellees' brief on appeal with the attached order. She claims that this order "demonstrate[s] the lengths that the [Mitchells] will go to usurp the authority of this Honorable Court to obtain their goal." Furthermore, Mother claims that the juvenile court judge's decision to encourage an immediate adoption demonstrates that she cannot act impartially in this case. In her reply brief, Mother asked this Court to require the appointment of a special judge to oversee any proceedings on remand.[33]

As Mother's attorney conceded at oral argument, she has not filed a motion for recusal pursuant to Tennessee Supreme Court Rule 1013. Rule 1013 expressly provides that "[t]he procedures set out in this Rule shall be employed to determine whether a judge should preside over a case." Tenn. S.Ct. Rule 1013. Given the mandatory language of this Rule, we de-

---

**32.** Counsel for the Mitchells was questioned about the adoption proceeding during oral argument before this Court. She stated that the Mitchells informed the chancellor about this pending appeal in the termination proceeding, and the chancellor proceeded with the adoption proceeding, without notice to Mother, after cautioning them that "this may get overturned."

**33.** Mother also asked for an award of attorney's fees "given the course of conduct of the appellees and their counsel." Finding no statutory or contractual basis for such an award, we decline to award Mother attorney's fees.

cline to consider whether the juvenile court judge should be recused at this juncture, but our holding does not preclude Mother from seeking such relief in accordance with that Rule. Moreover, should the juvenile court deny a Tenn. S. Ct. Rule 10B motion for recusal, our ruling does not preclude Mother from seeking an immediate appeal as provided in that rule.

## V. CONCLUSION

For the aforementioned reasons, we remand this matter to the juvenile court for the entry of an order that implements a plan to expeditiously reunite Alysia with her mother. Having found that the trial court erred in terminating Mother's parental rights, we dismiss the termination petition, reinstate Mother's parental rights,[34] vacate the juvenile court orders concerning visitation, and designate the current custody and guardianship orders as temporary in nature. Costs of this appeal are taxed to the appellees, Mr. and Mrs. Mitchell, for which execution may issue if necessary.

---

34. Reinstatement of Mother's parental rights necessarily requires the subsequent adoption to be set aside, and the Mitchells are directed to take necessary steps to have the adoption set aside.