IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 1, 2019

IN RE BOSTON G.

Appeal from the Juvenile Court for Warren County
No. 17-JV-1448      William M. Locke, Judge

_____

No. M2019-00393-COA-R3-PT

_____

A mother and father appeal the termination of their parental rights to their child.  The juvenile court determined that there was clear and convincing evidence of five grounds for terminating the father's parental rights and seven grounds for terminating the mother's parental rights.  The court also determined that there was clear and convincing evidence that termination of the mother's and the father's parental rights was in the child's best interest.  Upon our review, of the grounds actually alleged for terminating parental rights, only two against the father were supported by clear and convincing evidence.  And five of the six grounds alleged for terminating the mother's parental rights were supported by clear and convincing evidence.  We also conclude that termination of both parent's rights was in the child's best interest.  So we affirm the termination of the mother's and the father's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., J., and J. STEVEN STAFFORD, P.J., W.S., joined.

Joyce W. Cooper, McMinnville, Tennessee, for the appellant, Ashley K.

Tammy H. Womack, McMinnville, Tennessee, for the appellant, Tyler K.

Herbert H. Slatery III, Attorney General and Reporter, and Jeffrey D. Ridner, for the appellee, Tennessee Department of Children's Services.

## OPINION

### I.

#### A.

On February 3, 2017, the Chancery Court of Warren County, Tennessee, granted Ashley K. ("Mother") and her two-year-old son, Boston, an order of protection from the child's father, Tyler K. ("Father"). The chancery court found that Father had hit Mother with his car, running over her foot, on one occasion; had knocked out one of Mother's teeth by pushing her into a washing machine on another occasion; and had threatened Mother with a tire iron on yet another occasion. The court ordered that Father have no contact, either directly or indirectly, with Mother or Boston and to stay away from their home and Mother's workplace for a year.

In early May, despite the entry of the protective order, Father drove to Mother to drop off some diapers. Mother later informed a police officer that she walked out to Father's truck with Boston. She placed Boston in the front seat of Father's truck so that she could get the diapers. At that point, Father became irate and started grabbing and pushing Mother. Father then picked up the child, placing him on the ground, and grabbed Mother's leg. While still holding onto Mother, Father began driving down the driveway dragging Mother along while she dangled partially outside of the vehicle. Fortunately, the intervention of a passerby caused Father to relent, and he drove off. Father later pleaded guilty to reckless endangerment, domestic assault, and violation of the restraining order.

The domestic violence incident resulted in the intervention of the Tennessee Department of Children's Services ("DCS"). In juvenile court, DCS petitioned for, among other things, a restraining order against Father, for a protective supervision plan, and for a determination that Boston was dependent and neglected. *See* Tenn. Code Ann. §§ 37-1-152, 37-1-102(b)(24), 37-1-130(a)(1) (Supp. 2019). Following an adjudicatory and dispositional hearing in August 2017, the court found by clear and convincing evidence that Boston was dependent and neglected. But the court allowed legal and physical custody to remain with Mother. The court also restrained and enjoined Father from coming about Boston's person or home and from having any contact, "including in person, telephonic, or written contact, with [Boston]."

The court made Mother responsible for enforcing the restraining order and required her to report all violations or attempted violations to DCS. As part of its order, the court also placed a number of requirements on Mother and warned that, if Mother failed to comply, temporary legal custody of Boston would be awarded to DCS.

The very next month, the court awarded DCS temporary legal custody of Boston. The court found that Mother had contact with Father despite its restraining order, a fact that Mother admitted in a related court proceeding. The court also found that Mother had failed to provide DCS with contact information for anyone who watched Boston for her. Mother was permitted supervised visitation.

On September 18, 2017, DCS placed Boston in foster care, where he has remained. The next month, DCS created the first of two permanency plans. DCS prepared the first plan without the parents' involvement because they could not be located. But later DCS was able to discuss the plan responsibilities with them while they were in jail. Review hearings conducted by the juvenile court after ratification of the first plan showed little progress by Mother and no progress by Father in carrying out their respective responsibilities under the plan. In April 2018, DCS prepared a second permanency plan. Although, unlike the first plan, both parents appeared for the plan ratification hearing and agreed to the terms of the plan, they still made little or no progress toward completing their plan responsibilities. Following a review hearing in August, the court found that Mother was "not in substantial compliance in that she ha[d] not completed anything on the plan other than obtaining housing." Father had "not completed anything on the plan."

B.

On August 14, 2018, DCS petitioned the juvenile court to terminate both Mother's and Father's parental rights to Boston. The petition alleged six statutory grounds for terminating Mother's parental rights: abandonment by failure to support; abandonment by failure to visit; abandonment by failure to establish a suitable home; failure to substantially comply with the permanency plan; persistence of conditions; and her failure to manifest an ability and willingness to assume custody. The petition alleged three grounds for terminating Father's parental rights: abandonment by wanton disregard; failure to substantially comply with the permanency plan; and failure to establish parentage.

The court conducted a one-day trial. It heard testimony from the DCS family service worker who worked with Mother, Father, and Boston; from Mother; and from an employee of a long-term treatment facility. Mother had checked herself into the treatment facility in the month preceding the trial.

The court terminated both Mother's and Father's parental rights. The court concluded that DCS had proven by clear and convincing evidence seven grounds for terminating Mother's parental rights. The grounds included all those alleged in the petition plus an additional ground that had been only alleged against Father, abandonment by wanton disregard. The court concluded that DCS had proved by clear and convincing evidence five grounds for terminating Father's parental rights. The

3

grounds against Father included two of those alleged in the petition, abandonment by wanton disregard and failure to substantially comply with the permanency plan. The court added to those grounds abandonment by failure to establish a suitable home, persistence of conditions, and the failure to manifest an ability and willingness to assume custody. It found that DCS had not proven the ground of failure to establish parentage. Finally, the court concluded that there was clear and convincing evidence that termination of both Mother's and Father's parental rights was in Boston's best interest.

## II.

Tennessee Code Annotated § 36-1-113 sets forth both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). Parties seeking termination of parental rights must first prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated § 36-1-113(g). Tenn. Code Ann. § 36-1-113(c)(1) (Supp. 2019). If one or more statutory grounds for termination are shown, they then must prove that terminating parental rights is in the child's best interest. *Id.* § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c)). This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *Id.* "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

We review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); Tenn. R. App. P. 13(d). We then "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

On appeal, Mother argues only that the juvenile court "erred in finding that terminat[ion] . . . is in the child's best interest." Father raises three issues. First, he argues that DCS "failed to present clear and convincing evidence that it made reasonable efforts to provide the relevant assistance needed to regain custody of his child." As we

4

perceive Father's first issue, he is arguing that the proof did not support the ground of abandonment by failure to provide a suitable home. Second, Father argues that DCS "failed to present clear and convincing evidence that [he] willfully abandoned his child by failure to visit and provide child support." But abandonment by failure to visit and abandonment by failure to support were not grounds that the court relied on to terminate Father's parental rights. Finally, like Mother, Father argues that the court "erred in finding that terminat[ion] . . . is in the child's best interest."

A.

Although Mother challenges none of the seven grounds and Father challenges only one ground found applicable to him, we "must review the trial court's findings as to each ground for termination . . . regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016). We begin our analysis with the ground of abandonment, in several of its permutations.

## 1. Abandonment

One of the statutory grounds for termination of parental rights is "[a]bandonment by the parent." Tenn. Code Ann. § 36-1-113(g)(1). Abandonment as a ground for the termination of parental rights is defined in five different ways. *See id.* § 36-1-102(1)(A) (Supp. 2019) (defining the term "abandonment"). The juvenile court concluded that Mother and Father abandoned Boston under the second and fourth definitions of "abandonment."

### a. Abandonment by Failure to Provide a Suitable Home

Under the second definition of "abandonment," a parent's rights may be terminated if:

> (a) The child has been removed from the home or the physical or legal custody of a parent . . . by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of [DCS] . . . ;
> (b) The juvenile court found . . . that [DCS] . . . made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and
> (c) For a period of four (4) months following the physical removal, [DCS] . . . made reasonable efforts to assist the parent . . . to establish a suitable home for the child, but that the parent . . . ha[s] not made reciprocal reasonable efforts to provide a suitable home and ha[s] demonstrated a lack

5

of concern for the child to such a degree that it appears unlikely that the [parent] will be able to provide a suitable home for the child at an early date.

*Id.* § 36-1-102(1)(A)(ii).

We conclude that clear and convincing evidence supports terminating Mother's parental rights on the ground of abandonment by failure to provide a suitable home. The juvenile court removed Boston from Mother's custody and placed him in the custody of DCS on September 18, 2017. DCS made reasonable efforts to prevent the removal, including proposing protective supervision requirements while Boston remained in Mother's care. And DCS made reasonable efforts to assist Mother with establishing a suitable home. DCS attempted to stay in contact with Mother despite a lack of cooperation on her part, developed a permanency plan, and facilitated supervised visitation. For her part, Mother took no action to establish a suitable home until mid-2018. Even then, Mother lost that home due to failure to pay rent. The efforts of DCS were certainly reasonable in comparison with Mother's lack of effort. *See id.* § 36-1-102(1)(A)(ii)(c).

As for Father, abandonment by failure to provide a suitable home was not an appropriate ground for terminating his parental rights. DCS concedes on appeal that it did not "sufficiently" allege this ground for terminating Father's parental rights. In fact, DCS does not allege this ground at all against Father. We "strictly apply the procedural requirements in cases involving the termination of parental rights." *Weidman v. Chambers*, No. M2007-02106-COA-R3-PT, 2008 WL 2331037, at *6 (Tenn. Ct. App. June 3, 2008) (citing *In re W.B. IV*, No. M2004-00999-COA-R3-PT, 2005 WL 1021618 at *10 (Tenn. Ct. App. Apr. 29, 2005) and *In re M.J.B.*, 140 S.W.3d 643, 651 (Tenn. Ct. App. 2004)). And a fundamental component of due process is proper notice of the issues to be tried in the court. *In re W.B. IV*, 2005 WL 1021618, at *13. So unless a ground for termination is tried by implied consent, *see In re Alysia S.*, 460 S.W.3d 536, 564 (Tenn. Ct. App. 2014), parental rights may be terminated "only upon the statutory ground(s) alleged in the petition because otherwise the parent would be 'disadvantage[d] in preparing a defense.'" *In re Anthony R.*, No. M2012-01412-COA-R3-PT, 2013 WL 500829, at *4 (Tenn. Ct. App. Feb. 8, 2013) (quoting *In re W.B. IV*, 2005 WL 1021618, at *10). We do not find this ground was tried on implied consent against Father.

   b. Abandonment by an Incarcerated Parent by Failure to Support, by Failure to Visit, or by Wanton Disregard

The fourth definition of "abandonment" applies in cases in which the parent is incarcerated or had been incarcerated within the four-month period preceding the filing of the petition to terminate. Tenn. Code Ann. § 36-1-102(1)(A)(iv). Here, the relevant four-month period preceding the petition is April 14, 2018, to August 13, 2018, the day

6

before the petition was filed. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at \*6 (Tenn. Ct. App. Feb. 20, 2014). This definition of "abandonment" is applicable because Mother was incarcerated for a portion of the applicable four-month period and Father was incarcerated when the petition to terminate was filed.

An incarcerated or formerly incarcerated parent is deemed to have abandoned a child if he or she:

> has failed to visit or has failed to support or has failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's . . . incarceration, or the parent . . . has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

Tenn. Code Ann. § 36-1-102(1)(A)(iv). The juvenile court found by clear and convincing evidence that Mother abandoned Boston both by the failure to visit and the failure to support during the four consecutive months immediately preceding her May 25, 2018 incarceration. *See id.*

A parent has abandoned a child by failure to visit by failing "to visit or engage in more than token visitation" during the relevant time period. *Id.* § 36-1-102(1)(E). "Token visitation" is visitation that "constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." *Id.* § 36-1-102(1)(C).

We conclude that clear and convincing evidence supports terminating Mother's parental rights on the ground of abandonment by failure to visit. DCS scheduled visits every Tuesday with Boston. During the time period of January 2018 to May 2018, prior to Mother's incarceration, Mother only visited Boston once, on March 13, 2018. Mother asked multiple times for rescheduling of the visits. But when DCS did reschedule, Mother would still miss the visits. We agree with the juvenile court that Mother's one visit during the four-month period preceding her incarceration constituted token visitation.

Failure to support "means the failure . . . to provide monetary support or the failure to provide more than token payments toward the support of the child." *Id.* § 36-1-102(1)(D). DCS established that Mother was ordered to pay $87.00 per month for Boston's support. And during the four-month time period preceding her incarceration, Mother made a single support payment of $400. The court found that this one payment amounted to a token payment.

7

Based on our review, DCS failed to establish that the $400 payment was token.[1] *See In re Josiah T.*, No. E2019-00043-COA-R3-PT, 2019 WL 4862197, at *7 (Tenn. Ct. App. Oct. 2, 2019) (holding that the burden falls on the petitioner to prove support was "token support"). Support is token if "the support, under the circumstances of the individual case, is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B). A parent's means includes "both income and available resources for the payment of debt." *In re Adoption of Angela E.*, 402 S.W.3d 636, 641 (Tenn. 2013). According to the family service worker, Mother claimed to have worked at various places, but the family service worker was unsuccessful in verifying Mother's employment. The record lacks any evidence of Mother's income or expenses. So we cannot determine if the $400 payment Mother made was insignificant given her means.

As a final basis for abandonment, the court concluded that Mother and Father had both exhibited wanton disregard for Boston's welfare. Tenn. Code Ann. § 36-1-102(1)(A)(iv). "Wanton disregard" is not a defined term. We look for actions in the parent that "reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015). Such actions can include, either alone or in combination, "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child." *In re Audrey S.*, 182 S.W.3d 838, 867-68 (Tenn. Ct. App. 2005). A parent's criminal conduct and subsequent incarceration alone does not constitute wanton disregard, rather a "parent's incarceration [is] a triggering mechanism that allows the court to take a closer look . . . to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *Id.* at 866.

DCS proved an extensive list of Father's criminal convictions. Father was found guilty of driving on a revoked license; three violations of an order of protection; shoplifting; theft of property under $1000; theft; aggravated assault (domestic) and reckless endangerment. *See id.* §§ 55-50-504 (2017); (driving on a suspended or revoked license); 39-13-113 (2018) (violation of order of protection); 39-14-146 (2018) (shoplifting); 39-14-103, -105 (2018) (theft); 39-13-102 (2018) (aggravated assault (domestic)); and 39-13-103 (2018) (reckless endangerment). Father also violated his probation and was incarcerated for his violation. In several instances, Father's pre-incarceration interactions with Mother were violent. Father's past conduct leaves no serious doubt that he posed a risk of substantial harm to Boston's welfare.

---

[1] The parent bears the burden of proving that a failure to support was not willful. Tenn. Code Ann. § 36-1-102(1)(I).

As for Mother, wanton disregard was not an appropriate ground for terminating her parental rights. DCS did not allege that Mother abandoned Boston by wanton disregard as a basis for termination of Mother's parental rights. *See In re Anthony R.*, 2013 WL 500829, at *4 (recognizing that courts may only terminate parental rights on grounds alleged in the petition). On appeal, DCS argues that wanton disregard was an appropriate ground for terminating Mother's parental rights without mentioning its failure to allege the ground in its petition. It also does not argue that the issue was tried by implied consent. *See In re Alysia S.*, 460 S.W.3d at 564 (holding that a ground for termination may be tried by implied consent). So we do not address that question.

2. Substantial Noncompliance with Permanency Plans

The juvenile court also found that neither Mother nor Father was in substantial compliance with the requirements of the permanency plans. *See id.* § 36-1-113(g)(2). Before analyzing whether a parent complied with the permanency plan, the court must find that the permanency plan requirements that the parent allegedly failed to satisfy were "reasonable and are related to remedying the conditions that necessitate foster care placement." *Id.* § 37-2-403(a)(2)(C) (2014). Permanency plan requirements may focus on remedying "conditions related both to the child's removal and to family reunification." *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002).

Boston entered foster care primarily as a result of domestic violence and alcohol and drug abuse. We agree with the juvenile court that the requirements for both Mother and Father found in the permanency plans were reasonable and related to remedying the conditions that necessitated foster care.

Next, we must determine whether the noncompliance was substantial in light of the importance of the requirements to the overall plan. *See id.* at 548-49. "Substantial noncompliance is a question of law which we review de novo with no presumption of correctness." *Id.* at 548. A "[t]rivial, minor, or technical" deviation from the permanency plan's requirements does not qualify as substantial noncompliance. *In re M.J.B.*, 140 S.W.3d at 656. Our focus is on the parent's efforts to comply with the plan, not the achievement of the plan's desired outcomes. *In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *8 (Tenn. Ct. App. Mar. 2, 2009). We review the court's findings of fact concerning compliance with the requirements of the permanency plan de novo with a presumption of correctness. *See In re Valentine*, 79 S.W.3d at 547.

We conclude that the evidence was clear and convincing that Mother and Father failed to substantially comply with the requirements of the permanency plans. Mother met very few of the plan requirements and only appeared to take the requirements seriously as the trial approached. Due to his repeated incarcerations, Father completed none of the requirements of the permanency plans.

9

3. Persistence of Conditions

The juvenile court also concluded that termination of Mother's and Father's parental rights was appropriate under Tennessee Code Annotated § 36-1-113(g)(3), a ground commonly referred to as "persistence of conditions." *See In re Audrey S.*, 182 S.W.3d at 871. This ground for termination focuses "on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." *Id.* at 874. The goal is to avoid having a child in foster care for a time longer than reasonable for the parent to demonstrate the ability to provide a safe and caring environment for the child. *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010), *overruled on other grounds*, *In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015). So the question before the court is "the likelihood that the child can be safely returned to the custody of the [parent], not whether the child can safely remain in foster care . . . ." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000).

The ground of persistence of conditions applies when, by court order, a "child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months" as a result of a dependency and neglect petition. Tenn. Code Ann. § 36-1-113(g)(3)(A). Such removal can be the basis for the termination of parental rights if:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent . . . , or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent . . . ;
(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and
(iii) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

*Id.* Each of the statutory elements must be established by clear and convincing evidence. *In re Valentine*, 79 S.W.3d at 550.

We conclude that persistence of conditions was an appropriate basis for termination of Mother's parental rights. At the time of trial, Boston had been removed from Mother's custody for more than six months. *See* Tenn. Code Ann. § 36-1-113(g)(3)(B) ("The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard."). And this record contains clear and convincing evidence that conditions preventing Boston's safe return to Mother remained. The month prior to trial Mother had moved to a long-term treatment facility. She had yet

10

to address her issues with domestic violence, although, at the time of trial, her domestic violence classes were to start "within the next week or two." And she had barely begun to obtain a mental health assessment and drug and alcohol treatment.

We further conclude that the evidence was clear and convincing that there was little likelihood that these conditions would be remedied in the near future. Although Mother was optimistic at trial about her treatment, she testified that she was at the facility for grief counseling associated with the recent loss of a child, not treatment for drugs and alcohol abuse. On cross-examination, she admitted that she was at the facility as a result of a probation violation and risked incarceration if she did not finish the treatment. Mother also had a positive drug screen for Xanax, Suboxone, and marijuana in the month before trial.

We also have little difficulty in concluding that continuation of the parent and child relationship greatly diminishes Boston's chances of an early integration into a safe, stable, and permanent home. At the time of trial, Boston had been in foster care for 15 months. He had bonded with his foster family, who provided a safe and stable home. Although the treatment facility could make provision for Boston and did so for other mothers, Mother had yet to establish a record of success with her treatment.

We conclude that persistence of conditions was not an appropriate basis for termination of Father's parental rights. DCS did not allege persistence of conditions as a ground for terminating his rights. And DCS concedes this on appeal.

4.  Failure to Manifest an Ability and Willingness to Assume Custody or Financial Responsibility for the Child

Finally, the court found termination of parental rights appropriate for both Mother and Father under Tennessee Code Annotated § 36-1-113(g)(14). Under this ground, a parent's rights may be terminated if he or she

> [1] has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and [2] placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

*Id.* § 36-1-113(g)(14). Both prongs must be established by clear and convincing evidence. *See In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019).

We conclude that terminating Mother's parental rights on the ground of failure to manifest an ability and willingness to assume legal and physical custody was appropriate.

11

DCS established the first prong by showing by clear and convincing evidence that Mother did not exhibit an ability and willingness to personally assume legal and physical custody for Boston. Mother had only had two visits with Boston in the 15 months he was in foster care, one in March 2018 and one in October 2018. And her mental health assessment, drug and alcohol abuse, and domestic violence issues remained unaddressed. Her recent efforts at a long-term treatment facility notwithstanding, Mother remained unable to care for Boston without significant assistance.

The evidence is equally clear and convincing that returning Boston to Mother's custody would pose a risk of substantial harm to his physical or psychological welfare. Although "a risk of substantial harm" is "not amenable to precise definition":

> the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted). From the record, we can conclude that, if returned to Mother's custody, Boston faced a real hazard or danger and that it was more than a theoretical possibility. First, Father had shown himself to be violent, and despite this, Mother seemed unwilling or unable to stay away from Father. Second, as shown by a recent drug test, Mother had not addressed her drug abuse issues.

We conclude that failure to manifest an ability and willingness to assume custody or financial responsibility was not an appropriate basis for termination of Father's parental rights. DCS only alleged this as a ground for termination of Mother's parental rights. *See In re Anthony R.*, 2013 WL 500829, at *4 (recognizing that courts may only terminate parental rights on grounds alleged in the petition). On appeal, DCS argues that this was an appropriate ground for terminating Father's parental rights without noting its failure to allege this ground against Father in its petition. So once again, we do not address whether the issue was tried by implied consent. *See In re Alysia S.*, 460 S.W.3d at 564 (holding that a ground for termination may be tried by implied consent).

B.

Because "[n]ot all parental misconduct is irredeemable," our parental termination "statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). So even if a statutory ground for termination is established by clear and convincing evidence, we must also determine whether termination of parental rights is in the child's best interests. Tennessee Code Annotated § 36-1-113(i) lists nine best interest

12

factors. The "factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017). In reaching a decision, "the court must consider all of the statutory factors, as well as any other relevant proof any party offers." *Id.* at 682. The best interest analysis is a fact-intensive inquiry, and each case is unique. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004).

The focus of this analysis is on what is best for the child, not what is best for the parent. *In re Marr*, 194 S.W.3d at 499. Additionally, the analysis should take into account "the impact on the child of a decision that has the legal effect of reducing the parent to the role of a complete stranger." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006). Although "[f]acts relevant to a child's best interests need only be established by a preponderance of the evidence, . . . the combined weight of the proven facts [must] amount[ ] to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d at 535.

After considering all the statutory factors, the juvenile court determined that termination of parental rights was in Boston's best interest. The first two statutory factors look at the parents' current lifestyle and living conditions. The first factor focuses on whether the parent "has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the [parent's] home." Tenn. Code Ann. § 36-1-113(i)(1). The second factor considers the potential for lasting change. *See id.* § 36-1-113(i)(2) (asking "[w]hether the parent . . . has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible"). The court found that Mother and Father had not made an adjustment of their circumstances, conduct or conditions to make it safe to return Boston to them and that it did not "appear that it [wa]s going to happen any time soon." The evidence does not preponderate against these findings.

The third and fourth factors focus on the parents' relationship with the child. The third factor focuses on the consistency of visitation. *See id.* § 36-1-113(i)(3). The fourth factor considers "[w]hether a meaningful relationship has otherwise been established between the parent . . . and the child." *Id.* § 36-1-113(i)(4). The court found neither parent had "maintained regular visitation or other contact" with Boston. It further found that Mother and Father had not "been part of the child's life since June of 2017." The evidence does not preponderate against these findings.

The fifth factor evaluates the effect a change in caregivers would have on the child's emotional, psychological, and medical condition. *Id.* § 36-1-113(i)(5). The court found that it would be detrimental to Boston to move him from his foster home. At the time of trial, he had lived with the same foster family for over a year. He had bonded

with the family, who had provided the only safe and stable home he had ever known. This factor favors termination.

Under the sixth factor, the court determines whether the parent or another person residing with the parent "has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child" or another person in the home. *Id.* § 36-1-113(i)(6). The seventh factor focuses on the parents' home environment and ability to be a safe and stable caregiver. *See id.* § 36-1-113(i)(7) ("Whether the physical environment of the parent's . . . home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of [intoxicants] as may render the parent . . . consistently unable to care for the child in a safe and stable manner."). The juvenile court determined these "factors applied to some extent." The court found that Mother's and Father's "use of alcohol and controlled substances renders them consistently unable to care for the child in a safe and stable manner."

The eighth statutory factor evaluates the parents' mental and emotional health, asking "[w]hether the parent's . . . mental and/or emotional status would be detrimental to the child or prevent the parent . . . from effectively providing safe and stable care and supervision for the child." *Id.* § 36-1-113(i)(8). The court also determined that this factor "appl[ies] to some extent." The court referenced Mother's depression and grief from the recent loss of her newborn baby. Mother also had substance abuse issues. The court found that the parents were "not in a position now to parent the child." The evidence supports these findings.

The ninth factor looks at the parents' child support history. *See id.* § 36-1-113(i)(9). Mother's and Father's record of a lack of support also weighed in favor of terminating parental rights.

In sum, we agree with the juvenile court's best interest determination. The combined weight of the proven facts amounts to clear and convincing evidence that termination of Mother's and Father's parental rights is in Boston's best interest.

## III.

We conclude that there was clear and convincing evidence to support five of the six grounds alleged for terminating Mother's parental rights and two of the three grounds alleged for terminating Father's parental rights. We further conclude that there was clear and convincing evidence that termination was in the child's best interest. Thus, we affirm the judgment terminating Mother's and Father's parental rights.

_____
W. NEAL MCBRAYER, JUDGE

14